**ASB ALLEGIANCE REAL ESTATE FUND, Ebref Holding Company, LLC, and Dwight Lofts Holdings, LLC, Plaintiffs,**

v.

**SCION BRECKENRIDGE MANAGING MEMBER, LLC, Scion 2040 Managing Member, LLC, and Scion Dwight Managing Member, LLC, Defendants.**

C.A. No. 5843–VCL.

Court of Chancery of Delaware.

Submitted: June 18, 2012.

Decided: July 9, 2012.

---

23. Award Transcript at 107. The *Sugarland* analysis spans several pages. *See id.* at 103–08.

24. *See id.* at 93.

John L. Reed, Scott B. Czerwonka, DLA Piper LLP (US), Wilmington, Delaware; Bruce E. Falby, Bruce S. Barnett, Justin A. Brown, DLA Piper LLP (US), Boston, Massachusetts; Attorneys for Plaintiffs.

Gregory P. Williams, Kelly E. Farnan, Richards, Layton & Finger, P.A., Wilmington, Delaware; Kenneth T. Brooks, Richard J. Zecchino, Honigman Miller Schwartz and Cohn LLP, Lansing, Michigan; Attorneys for Defendants.

## OPINION

LASTER, Vice Chancellor.

By opinion dated May 16, 2012, affiliates of ASB Capital Management, LLC (collectively "ASB") obtained reformation of three limited liability company agreements (the "LLC Agreements") governing real estate joint ventures with affiliates of The Scion Group, LLC (collectively "Scion"). *See ASB Allegiance Real Estate Fund v.*

*Scion Breckenridge Managing Member, LLC,* 2012 WL 1869416 (Del.Ch. May 16, 2012) (the "Merits Decision"). The LLC Agreements contain fee-shifting provisions. Having prevailed, ASB is entitled to fees and costs in the amount of $3,267,355.31, comprising fees of $2,738,178.45 and costs of $529,176.86.

## I. FACTUAL BACKGROUND

By letter dated September 20, 2010, ASB notified Scion that unless Scion agreed to correct the erroneous LLC Agreements by close of business on September 21, ASB would file suit. Each joint venture was a Delaware limited liability company. Each of the LLC Agreements was governed by Delaware law. Any fiduciary duty or implied covenant claims would be governed by Delaware law. The three joint ventures were factually interconnected: ASB and Scion used the earliest of the three LLC Agreements as a template for the subsequent deals. Given these facts, logic and efficiency cried out for a single forum, preferably with a decision-maker knowledgeable about Delaware law.

Scion eschewed the efficient course. The next day, Scion preemptively filed suit over just one of the disputed joint ventures in the United States District Court for the Eastern District of Wisconsin, the site of the property Scion managed for that entity. On September 22, 2010, ASB filed this case. Unlike Scion, ASB placed at issue the entirety of the dispute, named all relevant parties, and sought reformation of all three LLC Agreements. Neither ASB nor Scion has operations in Delaware, so ASB could not be accused of picking its home forum.

Scion then filed two additional complaints in two other federal courts: the United States District Court for the Northern District of Illinois and the United States District Court for the Middle District of Florida. Each complaint sought to enforce a single LLC Agreement. In each case, Scion filed in the local federal court where the subject property was located. Each of Scion's three complaints pled substantially identical counts.

Scion now insists it had "a right to a federal forum" to resolve the questions of Delaware law posed by the litigation and contends that three federal actions were necessary because no single federal forum could exercise personal jurisdiction over the ASB parties. *See* Defs.' Objections 17. If Scion truly wanted a *single* federal forum, then the Illinois district court could have provided it; the extensive dispute-related activities of Keyvan Arjomand, a former ASB representative who worked out of ASB's Chicago office, would have given that court jurisdiction over the ASB entities. And if Scion truly wanted a *federal* forum, Scion could have tried the case in Florida district court in February 2012; instead, Scion agreed to stay the Florida action so that trial could proceed here in March 2012. Contrary to its protestations, Scion filed multiple lawsuits to make the litigation as difficult and expensive as possible for ASB, hoping to create leverage that would force a settlement more favorable to Scion than the merits of its position warranted.

Scion's tactics caused four courts and the parties to engage in overlapping, redundant, and otherwise unnecessary activities. Motions to stay were filed, briefed, and decided in each of the federal cases. Motions to dismiss were filed, briefed, and decided in all four cases. Motions for summary judgment were filed, briefed, and decided in all four cases. Multiple courts heard motions on discovery and pre-trial issues. As the cases proceeded, renewed motions to stay were filed, briefed, and decided. At least two emer-

gency applications were made to this Court for an expedited decision to help avoid a multi-jurisdictional train wreck.

After the issuance of the Merits Decision, the parties dismissed the federal cases by stipulation. ASB now seeks $3,267,355.31 in fees and costs. The sum includes not only fees and costs relating to ASB's affirmative claims for relief in this case, but also Scion's counterclaims and the federal cases.

## II. LEGAL ANALYSIS

 Section 9.9 of the LLC Agreements governs ASB's entitlement to fees and costs. It provides:

> In the event that any of the parties to this Agreement undertakes any action to enforce the provisions of this Agreement against any other party, the non-prevailing party shall reimburse the prevailing par[ty] for all reasonable fees and costs incurred in connection with such enforcement, including reasonable attorneys' fees....

JX 82; *accord* JX 48; JX 76. When determining the scope of recovery under such a provision, "[c]ourts focus principally on enforcing the parties' agreement to make the prevailing party whole." *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *6 (Del.Ch. Aug. 13, 2010). "Absent any qualifying language that fees are to be awarded claim-by-claim or on some other partial basis, a contractual provision entitling the prevailing party to fees will usually be applied in an all-or-nothing manner." *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC*, 2009 WL 458779, at *8 (Del.Ch. Feb. 23, 2009). Having found ASB's fee request to be reasonable, I award all.

## A. The Summer Leasing Claims

Scion contends that ASB cannot recover fees and costs relating to counterclaims in which Scion asserted that ASB breached its fiduciary duties and violated the implied covenant of good faith and fair dealing by failing to maximize summer leasing revenue for Dwight Lofts. As a threshold matter, Scion itself sought to hold ASB "contractually liable to [Scion] for all reasonable fees and costs [Scion] incurs in connection with enforcing its rights under the LLC Agreement" relating to the summer leasing claims. Countercl. at 109, 111. Having asserted its own right to contractual fee shifting, Scion cannot now flip-flop and deny the same right to ASB. Regardless, these causes of action fall within Section 9.9.

 Scion's breach of fiduciary duty counterclaim sought to enforce the Dwight Lofts LLC Agreement. According to Scion, ASB's fiduciary duties arose out of its alleged status as *de facto* Managing Member under that agreement. In its submissions to this Court, Scion invoked Section 5.1.1 of the Dwight Lofts LLC Agreement as the basis for imposing fiduciary duties on ASB. *See* Countercl. ¶¶ 204, 206; Counter–Pl.'s Opening Pre–Trial Br. 74–75; *see also* Merits Decision at *18–19. Scion thus sued "to enforce the provisions of [the Dwight Lofts LLC] Agreement." As the "non-prevailing party," Scion must "reimburse the prevailing par[ty]" for its fees and costs.

 Scion's implied covenant claim likewise sought to enforce the Dwight Lofts LLC Agreement, albeit by invoking an implied term. Under Delaware law, an implied covenant claim does not sound in tort. It is contractual.[1]

1. *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) ("The implied covenant of good faith and fair dealing is a creature of contract ....."); *accord Tekstrom, Inc. v. Savla*, 918

■ The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them. Under Delaware law, a court confronting an implied covenant claim asks whether it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del.Ch.1986) (Allen, C.); *accord Pressman*, 679 A.2d at 443. "While this test requires resort to a counterfactual world—what if—it is nevertheless appropriately restrictive and commonsensical." *Schwartzberg v. CRITEF Assocs. Ltd. P'ship*, 685 A.2d 365, 376 (Del.Ch.1996) (Allen, C.).

The temporal focus is critical. Under a fiduciary duty or tort analysis, a court examines the parties as situated at the time of the wrong. The court determines whether the defendant owed the plaintiff a duty, considers the defendant's obligations (if any) in light of that duty, and then evaluates whether the duty was breached. Temporally, each inquiry turns on the parties' relationship as it existed at the time of the wrong. The nature of the parties' relationship may turn on historical events, and past dealings necessarily will inform the court's analysis, but liability depends on the parties' relationship when the alleged breach occurred, not on the relationship as it existed in the past.

■ An implied covenant claim, by contrast, looks to the past. It is not a "free-floating duty unattached to the underlying legal documents." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (alteration and internal quotation marks omitted). It does not ask what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting. *See Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del.2010) (addressing implied covenant claim by supposing "the parties to the Stock Plan specifically addressed the issue *at the time of the contract*"); *Amirsaleh v. Bd. of Trade of N.Y., Inc.*, 2009 WL 3756700, at *4 (Del.Ch. Nov. 9, 2009) ("The parties' reasonable expectations are determined by inquiring whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose."). "Fair dealing" is not akin to the fair process component of entire fairness, *i.e.*, whether the fiduciary acted fairly when engaging in the challenged transaction as measured by duties of loyalty and care whose contours are mapped out by Delaware precedents. It is rather a commitment to deal "fairly" in the sense of consistently with the terms of the parties' agreement and its purpose. Likewise "good faith" does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract. Both necessarily turn on the contract itself and

A.2d 1171, 2007 WL 328836, at *7 (Del.2007) (ORDER) ("The covenant of good faith and fair dealing arises under contract."); *E.I. Du-Pont de Nemours and Co. v. Pressman*, 679 A.2d 436, 444–48 (Del.1996) (recognizing implied covenant claim in employment context

and specifying contractual remedies available for breach); *Tackett v. State Farm Fire & Cas. Inc. Co.*, 653 A.2d 254, 264 (Del.1995) (holding that implied covenant claim against insurer for "bad faith" denial of claim by insured sounds in contract).

what the parties would have agreed upon had the issue arisen when they were bargaining originally.

 The retrospective focus applies equally to a party's discretionary rights. The implied covenant requires that a party " 'refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of its bargain." *Dunlap*, 878 A.2d at 442 (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch. 1985)). When exercising a discretionary right, a party to the contract must exercise its discretion reasonably.[2] The contract may identify factors that the decision-maker can consider,[3] and it may provide a contractual standard for evaluating the decision.[4] Express contractual provisions always supersede the implied covenant, but even the most carefully drafted agreement will harbor residual nooks and crannies for the implied covenant to fill.[5] In those

2. *See, e.g., Desert Equities, Inc. v. Morgan Stanley Leveraged Equity, II, L.P.*, 624 A.2d 1199, 1206 (Del.1993) ("[W]hile ... the Partnership Agreement provides the General Partner discretionary authority to exclude a limited partner from participation in an investment when participation would have a material adverse effect, the General Partner is obliged to exercise that discretion in a *reasonable* manner." (citation omitted)); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del.Ch.2009) ("When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."); *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 922 (Del.Ch.1999) (finding indemnitor breached the implied covenant of good faith and fair dealing by exercising its "broad discretion" to choose indemnitee's counsel unreasonably), *aff'd*, 748 A.2d 407 (Del.2000); *Wilm. Leasing, Inc. v. Parrish Leasing Co.*, 1996 WL 560190, at *2–3 (Del.Ch. Sept. 25, 1996) (holding that discretionary right to remove general partner must be exercised reasonably).

3. *See, e.g., Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977, 985 (Del.Ch.2001) (interpreting provision of limited partnership agreement that defined "sole discretion" as authorizing general partner to consider "in each case, the relative interests of each party to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interest, any customary or accepted industry practices, and any applicable generally accepted accounting principles," "to consider only such interests and factors as it desires," and to "have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership, the Operating Partnership, the Limited Partners or the Assignees" (emphasis omitted)); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1476663, at *6 (Del.Ch. Sept. 27, 2000) (interpreting similar provision).

4. *See, e.g., Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1020 (Del.Ch.2010) (interpreting provision of limited partnership agreement providing that "any resolution or course of action by [Holdings GP] or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement or of any agreement contemplated herein or therein, or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Units excluding Units owned by [Holdings GP] and its Affiliates, (iii) on terms no less favorable to [Holdings] than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to [Holdings], taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership"))); *Brickell P'rs v. Wise*, 794 A.2d 1, 2–5 (Del.Ch.2001) (interpreting similar provision).

5. *See Gerber v. Enter. Prods. Hldgs., LLC*, 2012 WL 34442, at *9–11 (Del.Ch. Jan. 6, 2012) (holding that provision in limited partnership agreement which stated that a transaction receiving "Special Approval" from an audit committee would be "permitted and deemed approved by all Partners, and shall not constitute a breach of th[e limited partnership agreement] or of any agreement contemplated

situations, what is "arbitrary" or "unreasonable"—or conversely "reasonable"—depends on the parties' original contractual expectations, not a "free-floating" duty applied at the time of the wrong. *See Nemec*, 991 A.2d at 1128 (considering whether "at the time of contracting, both parties would reasonably have expected [the plaintiffs] to participate in the buy out"); Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1480–81 (2005) ("Delaware cases generally support the proposition that the Implied Covenant requires that such discretion must be exercised in good faith and consistent with the reasonable expectations of the parties.").

■■■■ There are references in Delaware case law to the implied covenant turning on the breaching party having a culpable

mental state analogous to the *scienter* requirement of fraud and other intentional torts. *See Amirsaleh*, 2009 WL 3756700, at *5 n. 24 (collecting cases). Proving a breach of contract claim does not depend on the breaching party's mental state.[6] A *scienter* requirement might seem to uproot the implied covenant from the land of contract and replant it in the realm of tort. *See* Defs.' Objections 25 (citing cases from other jurisdictions treating an implied covenant breach as a tort).

The view that an implied covenant breach requires a culpable mental state under Delaware law can be traced to *Merrill v. Crothall-American, Inc.*, 606 A.2d 96 (Del.1992).[7] There, the Delaware Supreme Court held that an at-will employee could bring a claim for breach of the implied covenant, but that "to constitute a breach of the implied covenant of good

---

... therein, or of any duty stated or implied by law or equity" remained subject to review for compliance with the implied covenant of good faith and fair dealing); *Lonergan*, 5 A.3d at 1021 ("The plaintiff correctly contends that the implied covenant constrains the Special Approval process."); *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 390 (Del. Ch.2010) (noting that "Special Approval" as defined by partnership agreement "must have been given in compliance with the implied covenant of good faith and fair dealing"); *see also Amirsaleh v. Board of Trade of City of New York, Inc.*, 2008 WL 4182998, at *1 (Del. Ch.2008) ("No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency.").

6. *See NACCO Indus., Inc. v. Applica, Inc.*, 997 A.2d 1, 35 (Del.Ch.2009) (noting Delaware's recognition of efficient breach); *Hifn, Inc. v. Intel Corp.*, 2007 WL 2801393, at *13 (Del.Ch. 2007) ("[T]o the extent that [plaintiff] is contending that [defendant's] subjective motivations for wanting out of the contract give rise to an inference that it acted in bad faith, that argument fails under settled law."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del.Ch. 1984) (holding that when party enforces con-

ditions that "are expressed, the motivation of the invoking party is, in the absence of fraud, of little relevance"), *aff'd*, 575 A.2d 1131 (Del. 1990). *See generally* Restatement (Second) of Contracts ch. 16, introductory n. (1981) ("The traditional goal of the law of contract remedies has not been compulsion of the promisor to perform his promise but compensation of the promisee for the loss resulting from breach. 'Willful' breaches have not been distinguished from other breaches....").

7. *See Amirsaleh*, 2009 WL 3756700, at *5 ("This Court has previously held that breach of the implied covenant of good faith and fair dealing 'implicitly indicates bad faith conduct.'" (quoting *Continental Ins. Co. v. Rutledge & Co. Inc.*, 750 A.2d 1219, 1234 (Del.Ch. 2000))); *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *15 n. 51 (Del.Ch. Mar. 13, 2000) (quoting *Continental*); *Continental*, 750 A.2d at 1234 ("Violating the implied covenant of good faith and fair dealing implicitly indicates bad faith conduct. The Delaware Supreme Court has explicitly held that a claimant must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation in order to prove a breach of the implied covenant." (citing *Merrill*, 606 A.2d at 101)).

faith, the conduct of the employer must constitute an aspect of fraud, deceit or misrepresentation." *Merrill*, 606 A.2d at 101 (internal quotation marks omitted). This holding recognized that even when agreeing to a contractual relationship that either party could terminate at will, parties generally would not grant each other the right to commit fraud. It would be a rare party who, in the original bargaining position, would agree that their counterparty could defraud him. Absent explicit anti-reliance language pursuant to which a sophisticated party knowingly assumes risk, *see RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 110, 115 (Del. 2012), a court can presume that the question "Can I lie to you?" would have been met with a resounding "No." Proof of fraud therefore violates the implied covenant, not because breach of the implied covenant requires fraud, but because "no fraud" is an implied contractual term.

In *Pressman*, the Delaware Supreme Court again addressed the implied covenant in the context of an at-will employment relationship. There, the employee claimed that the employer falsified and manipulated an employment record to create fictitious grounds for termination. 679 A.2d at 443–44. The Supreme Court agreed that this gave rise to an implied covenant breach: one can readily infer that if raised during the original negotiations, the employee would have refused to give the employer the authority to fabricate records. Importantly, the Supreme Court made clear that the culpable mental state did not relate to the contract breach. As the high court explained, "the trial court overstated the issue in its charge to the jury by permitting the jury to find in [the employee's] favor if they found that [the employer] discharged [the employee] maliciously, that is as a result of hatred, ill will *or* intent to injure. . . ." *Id.* at 444 (internal quotation marks omitted). With-

out the additional fraudulent act of falsifying employment records, ill will did not transform a lawful termination into a covenant breach. This holding restated and applied the general rule that a party's motive for contractual compliance or non-compliance is irrelevant. *See Gilbert*, 490 A.2d at 1055. Similarly, the existence of innocent (even negligent) errors in the employee's records would not have given rise to a covenant breach, because it could not be inferred that an employee would insist that the employer be absolutely accurate and strictly liable for any errors. Only the combination of ill motive and the manufacture of fictitious information rose to the level of fraud and therefore fell outside what the parties would have agreed to when negotiating originally. *Pressman*, 679 A.2d at 444 ("Since an assurance of continued employment is antithetical to at-will employment, no legally cognizable harm arises solely from the termination itself. Here, the harm derives from [the] creation of false grounds and manufacturing a record in order to establish a fictitious basis for termination." (citation omitted)). As in *Merrill*, the culpable mental state was not necessary for the implied covenant claim, but rather to satisfy the specific requirements of the implied contractual term ("no fraud").

■■■ Other aspects of the implied covenant in the context of at-will employment confirm that a culpable mental state is not required for breach. The Delaware Supreme Court has identified four situations when an at-will employee can claim a violation of the implied covenant:

(i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one; (iii) where the employer used its superior bargaining power to deprive an

employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds.

*Lord v. Souder*, 748 A.2d 393, 401 (Del. 2000) (internal quotation marks omitted) (citing *Pressman*, 679 A.2d at 442–44). Only the fourth—fraud—requires a culpable mental state. The first—public policy—implies contractual terms that the parties must have agreed upon because the law mandates them and forbids contrary agreements.[8] The second envisions a situation in which the at-will employment relationship is modified by a condition or undertaking. *See Souder*, 748 A.2d at 404 (Lamb, V.C., sitting by designation, concurring). The third implies a specifically identified term: the employer's agreement not to attempt to force the at-will employee to waive clearly identifiable and earned compensation.

■■■■ Proving fraud thus offers one way of establishing a breach of the implied covenant, but not the only way. Proving fraud represents a specific application of the general implied covenant test, *viz.*, what would the parties have agreed to when bargaining initially? The same is true when a court speaks of an implied covenant claim requiring intentional breach: parties can agree to contract terms that require a particular mental state, and a court can imply a similar provision.[9] Incorporating a mental state or other tort-like concepts assists in measuring when a defendant's conduct passes beyond what the contracting parties would have agreed to in their original bargaining positions. It does not convert a breach of the implied covenant into a tort. The elements of an implied covenant claim remain those of a breach of contract claim: "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del.Ch. Nov. 10, 1998).

■■■■ Notwithstanding the covenant's potentially misleading moniker and deci-

---

**8.** *See Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 829–30 (Del.2005); (recognizing claim for breach of the implied covenant based on race discrimination; implying term that employee will not be subjected to disparate treatment violating Title VII of the Civil Rights Act of 1964); *Schuster v. Derocili*, 775 A.2d 1029, 1039–40 (Del.2001) (recognizing claim for breach of the implied covenant where employee alleged she was fired for refusing to submit to employer's sexual advances; implying term that employment would not be conditioned on acceptance of sexual harassment); *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 585–89 (Del.Ch.1994) (Allen, C.) (recognizing claim for breach of implied covenant by attorney who alleged retaliatory termination due to having refused employer's direction to engage in conduct that would have violated Delaware Rules of Professional Conduct; implying term that employee would not be fired for refusing to violate her ethical obligations).

**9.** *Compare Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746–48 (Del. Ch.2008) (interpreting merger agreement in which limitation on liability did not apply to a "knowing and intentional breach") *with Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1999 WL 893575, at *10 (Del.Ch. Oct. 13, 1999) (implying term requiring knowledge and intent by holding that preferred stockholders could prove an implied covenant breach if the board of directors, in an attempt "to frustrate the [preferred stockholders'] right to a liquidation preference ...", intentionally embarked upon a course of action tantamount to a liquidation and did so in bad faith"), *aff'd*, 751 A.2d 878 (Del.2000) *and Desert Equities*, 624 A.2d at 1208 (implying term requiring proof of tortious mental state by holding that limited partner stated claim for breach of implied covenant where complaint alleged that "the General Partner has willfully, wrongfully and in bad faith excluded plaintiff from participating in three or more Fund II investments in retaliation for plaintiff's lawsuit").

sional references to a culpable mental state, a claim for breach of the implied covenant is a contract claim, requires proof of breach-of-contract elements, and yields contract remedies. Because Scion's implied covenant counterclaims sought to enforce an implied term of the Dwight Lofts LLC Agreement, the fees and costs that ASB incurred prevailing on that claim qualify for reimbursement under Section 9.9.

## B. The Federal Cases

Scion objects to ASB recovering fees and costs incurred in the federal cases. Putting to the side the fees and expenses relating to the summer leasing claims, approximately 87% of ASB's fees and costs were incurred exclusively in this case or on work (such as discovery) used in both this case and in at least one of the federal cases. Subject to reasonableness review, ASB is entitled to recover these amounts. *See Danenberg v. Fitracks, Inc.*, 2012 WL 11220, at *7 (Del.Ch. Jan. 3, 2012) (awarding fees and expenses that benefitted multiple defendants to the extent petitioner "would have incurred [them] if [petitioner] were the sole third-party defendant").

Scion observes that ASB could not recover fees and costs *in the federal cases themselves* because Federal Rule of Civil Procedure 9(g) purportedly requires that ASB have pled attorneys' fees as an element of special damages in the federal cases, which ASB did not do. Scion appears to misstate the law. *See, e.g., Rissman v. Rissman*, 229 F.3d 586, 587–88 (7th Cir.2000); *Capital Asset Research Corp. v. Finnegan*, 216 F.3d 1268, 1269–73 (11th Cir.2000). Regardless, the procedural rules that could have applied in the federal cases do not govern ASB's contractual right of recovery in this case.

▮▮▮ ASB is entitled to recover fees and costs incurred solely in connection with the federal cases. The four lawsuits formed one single controversy. The contract claims Scion pursued in the federal cases sought to enforce the erroneous LLC Agreements as drafted. Because Scion refused to stay those cases, ASB had to defend them to preserve its right to obtain reformation. If Scion prevailed in one of the federal cases, then the resulting final judgment would have had preclusive effect in this proceeding. ASB therefore incurred fees and costs in the federal cases "in connection with" an action to enforce the LLC Agreements, and those fees and cost therefore are covered by Section 9.9. *See Cohen v. Cohen*, 269 A.2d 205, 207 (Del.1970) (upholding fee award as "entirely proper" where "three separate actions [were] in fact one continuous piece of litigation which ultimately resulted in a settlement of the differences of the parties"); *see also Stathos v. Bowden,* 728 F.2d 15, 22 (1st Cir.1984) (awarding fees incurred by prevailing plaintiffs in related action in different forum that could have resulted in a preclusive judgment).

## C. The Reasonableness Of The Fee Award

▮▮▮ This Court has discretion to determine a reasonable fee award. *Mahani v. EDIX Media Gp., Inc.*, 935 A.2d 242, 245 (Del.2007). "To assess a fee's reasonableness, case law directs a judge to consider the factors set forth in the Delaware Lawyers' Rules of Professional Conduct...." *Id.* at 245–46 (footnote omitted). The factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Del. Lawyers' Rules of Prof'l Conduct R. 1.5(a). A trial court also should consider "whether the number of hours devoted to litigation was excessive, redundant, duplicative or otherwise unnecessary." 935 A.2d at 247–48 (internal quotation marks omitted).

■■■■ A party seeking fees carries its burden to justify the services performed by showing that they were "thought prudent and appropriate in the good faith professional judgment of competent counsel." *Delphi Easter P'rs Ltd. P'ship v. Spectacular P'rs, Inc.*, 1993 WL 328079, at *9 (Del.Ch. Aug. 6, 1993) (Allen, C.). "For a Court to second-guess, on a hindsight basis, an attorney's judgment . . . is hazardous and should whenever possible be avoided." *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1998 WL 155550, at *4 (Del.Ch. Mar. 30, 1998), *aff'd*, 720 A.2d 542 (Del.1998). Based on my review of the record, I find that the services rendered in this case fall well within the scope of competent counsel's good faith professional judgment.

■■■ ASB seeks fees and expenses of $3,267,355.31. The attorneys' fee component was calculated using the rates DLA Piper customarily charges ASB, which are their standard hourly rates discounted by 10%. The lawyers who staffed the matter in this case are able and experienced practitioners, and they charged what are readily recognizable as reasonable rates for complex commercial litigation. That Scion's lawyers charged lower rates does not render DLA Piper's rates unreasonable in light of DLA Piper's prominence, the qualifications of its practitioners, and the legal market in which the firm provides services.

That Scion's lawyers incurred fewer hours working on the case likewise does not undercut the reasonableness of ASB's request. Competent counsel may deem it prudent and appropriate to devote more or less hours to a task. For example, to prepare for the expert depositions, ASB's lead attorney devoted 67 hours; Scion's counsel devoted 31 hours. At trial, the DLA Piper attorney destroyed the credibility of Scion's expert. ASB's expert, by contrast, was unshaken on cross-examination. Preparation matters.

There are other reasons why DLA Piper spent more hours on the case. One is the strangely disproportionate document discovery burden. ASB produced 97,947 pages and logged 167 documents. Scion produced 20,583 pages and logged 9 documents. In a bilateral dispute where both sides should have had approximately the same number of documents, I have to wonder about Scion's document collection effort. Another is Eric Bronstein, Scion's in-house counsel, who was deeply involved in the litigation. The record indicates that Eric Bronstein performed material amounts of legal work, including reviewing documents, selecting deposition exhibits, and preparing deposition outlines, thereby reducing the time that Scion's outside counsel devoted to these matters.

Scion has raised additional, nit-picking objections that are not supported by the facts, have been adequately explained by ASB, and which do not warrant reductions.

Having carefully considered the factors set forth in Rule of Professional Conduct 1.5(a), I find that ASB's request is reasonable.

## D. Fee Allocation

The unitary dispute that the parties litigated in four courts involved three contracts, each governing a joint venture between an entity-specific affiliate of ASB and an entity-specific affiliate of Scion. A contractual fee-shifting provision only can be enforced against a party to the contract. Scion therefore argues that any fee award must be allocated such that each particular Scion affiliate is held liable for a specific amount to each specific ASB affiliate.

██ For the fees and costs that were not related to summer leasing activities, allocation is impractical and unnecessary. The three joint venture agreements presented different facets of the same case. Except on frictional issues, the core substantive work would have been performed whether the litigation was fought over three agreements, as in Delaware, or over one agreement with the other two as context, as in each of the federal actions. The frictional work was just that—frictional—and resulted from having three entities, rather than a single entity. Because no one entity was to blame, it makes little sense to attempt to allocate the core substantive work artificially by assigning a portion to a particular contract or entity. The three Scion affiliates—Scion Dwight Managing Member, LLC; Scion 2040 Managing Member, LLC; and Scion Breckenridge Managing Member, LLC—are therefore jointly and severally liable for $2,592,290.15, representing the fees and costs incurred for issues other than the summer leasing dispute.

The summer leasing issues, by contrast, only concerned Dwight Lofts. Those fees and costs must be borne solely by Scion Dwight Managing Member, LLC, the Scion entity that was a party to the Dwight Lofts LLC Agreement. Scion Dwight is therefore additionally liable for $675,065.16, representing the fees and costs incurred in the summer leasing dispute.

## III. CONCLUSION

Scion forced ASB to litigate duplicative claims in four jurisdictions concurrently. ASB prevailed on all counts and is entitled to recover costs and expenses of $3,267,355.31 allocated as follows: (i) $2,592,290.15 against Scion Dwight Managing Member, LLC; Scion 2040 Managing Member, LLC; and Scion Breckenridge Managing Member, LLC, jointly and severally, and (ii) an additional $675,065.16 against Scion Dwight Managing Member, LLC. Post-judgment interest will accrue at the legal rate, compounded quarterly, until the date of payment. **IT IS SO ORDERED.**