# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ERIC DOUGLAS GUILBEAU, *et al.*,

      Plaintiffs,

      v.

FOOTPRINT INTERNATIONAL HOLDCO, INC., CLEVELAND AVENUE, LLC, FOOTPRINT CA LLC, CA OPPORTUNITY FUND I LLC, CLEVELAND MANOR INVESTMENTS II LLC, CA FOOD I FUND LLC, OLYMPUS GROWTH FUND VII, L.P., OLYMPUS GROWTH FUND VII PARALLEL, L.P., MOVENDO CAPITAL, B.V., ZENCAP HOLDINGS FP, LLC, DON THOMPSON, MANU BETTEGOWDA, STEFAN KIRSTEN, HILLA SFERRUZZA, BRIAN KRZANICH, RICHARD J. DALY, KEVIN EASLER, LESLIE BRUN, and YOKE CHUNG,

      Defendants.

C.A. No. 2024-0968-JTL

## OPINION ADDRESSING RULE 12(B)(6) MOTIONS TO DISMISS

Date Submitted: February 3, 2026
Date Decided: April 30, 2026

Timothy R. Dudderar, Aaron R. Sims, Ellis H. Huff, Camilia R. Stoyanova, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Plaintiffs Eric Douglas Guilbeau, as the trustee of the Guilbeau Living Trust Dated November 11, 2003, Paul Winandy, 356 Investments, LLC, Arch Partners LLC, Jason Anderson, Brian Francis Austin, Tanner Blaine Bickelhaupt, Steven W. Carter, Marisa A. Dulin, Eric J. Guilbeau, Ivan Dean Johnson, Joseph R. Kosakowski, Wallace Jay Lovelace, David Michael McGowan, Geoffrey Emeka Mobisson, Shawn David Olson, Jeffrey Lee Smith, Daniel Joseph Tiernan, Yasmin Rahimi, as the trustee of the Rahimi Twins Trust, Craig Bruya, Second Avenue Partners LLC, Tracy Neighbors, and Marcus Labastida II.*

Daniel A. Mason, Sabrina M. Hendershot, Miranda N. Gilbert, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Susanna M. Buergel, Geoffrey Chepiga, Marques Tracy, PAUL, WEISS, RIFKIND, WHARTON

& GARRISON LLP, New York, New York; *Attorneys for Defendants Footprint International Holdco, Inc., Don Thompson, Manu Bettegowda, Stefan Kirsten, Hilla Sferruzza, Brian Krzanich, Richard J. Daly, Kevin Easler, Leslie Brun, and Yoke Chung.*

Kaan Ekiner, Nathan D. Barillo, COZEN O'CONNOR, Wilmington, Delaware; Michael de Leeuw, Tamar Wise, COZEN O'CONNOR, New York, New York; *Attorneys for Defendants Cleveland Avenue, LLC, Footprint CA LLC, CA Opportunity Fund I LLC, Cleveland Manor Investments II LLC, CA Food I Fund LLC, Olympus Growth Fund VII, L.P., Olympus Growth Fund VII Parallel, L.P., and Movendo Capital, B.V.*

Ronald N. Brown, III, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; *Attorneys for Defendant Zencap Holdings FP, LLC.*

**LASTER, V.C.**

Early stage friends-and-family investors acquired Class A preferred stock. They now challenge a cram-down financing, claiming it resulted from breaches of contract. The defendants moved to dismiss those claims under Rule 12(b)(6). Their motions are granted.[1]

## I. FACTUAL BACKGROUND

The facts are drawn from the second amended complaint (the "Complaint") and the documents it incorporates by reference.[2] At this procedural stage, the court must credit the Complaint's well-pled allegations and draw all reasonable inferences in the plaintiffs' favor.

### A. The Company And The Class A Offering

Footprint International Holdco, Inc. (the "Company") develops biodegradable food packaging. The Company is a Delaware corporation with its principal place of business in Phoenix, Arizona.

Troy Swope and Yoke Chung co-founded the Company. Swope served as CEO until January 2023. Chung is the Chief Technology Officer.

---

[1] The court will issue a separate decision addressing the fiduciary and related claims. The court will not enter an order implementing this decision until after the separate decision has issued. The time for any motion for reconsideration, any application for interlocutory appeal, or any similar relief will run from the date of the implementing order. That is an accommodation, not an invitation.

[2] Citations in the form "Compl. ¶ ___" refer to paragraphs of the Complaint, which is the operative pleading. Dkt. 55. Citations in the form "Ex. ___ at ___" refer to exhibits to the Complaint. *Id.*

In 2019 and early 2020, the plaintiffs invested in the Company via a private offering of Class A non-participating preferred stock. Approximately eighty friends-and-family investors participated in the round. Each paid $25,000 per share. No single participant acquired or possessed a majority position in the Class A stock. The round raised approximately $90 million.

In connection with the offering, the Class A stockholders signed a governance agreement dated October 1, 2019 (the "Governance Agreement"). Over time, the parties entered into a series of amended and restated versions of the Governance Agreement, so it is helpful to refer to this version as the "First Agreement."[3] The other parties to the First Agreement were the Company, Chung, and ZenCap Holdings FP, LLC ("ZenCap"), an investment vehicle affiliated with Zenfinity Capital LLC that already owned common stock and acquired Class A stock.

The First Agreement provided that the Company's board of directors (the "Board") would consist of five directors.[4] ZenCap would designate three directors for as long as it held at least 10% of the issued and outstanding equity. ZenCap designated Swope, Chung, and Kevin Easler, the founder, Chairman, and CEO of Zenfinity Capital.[5]

---

[3] Ex. B.

[4] *Id.* § 4.2.

[5] *See* Dkt. 65, Ex. 2 at 282.

The holders of a majority of the outstanding shares of Class A stock would designate one director (the "Class A Director").[6] The Class A stockholders designated Brian Krzanich, the former CEO of Intel Corporation.[7]

The fifth director had to be an independent third party whom the other directors regarded as an industry expert or who could provide value to the Board and who was acceptable to a majority of the holders of common stock (the "Common-Approved Director"). The First Agreement named Les Brun, the co-founder, Chairman, and CEO of Ariel Alternatives, LLC ("Ariel"), a private asset management firm.[8]

The First Agreement granted the Class A stockholders a favorable liquidation preference equal to 1.4x of the purchase price plus the top spot in the liquidation distribution waterfall. The First Agreement prohibited the Company from changing the Class A stock's "rights, powers or preferences" except with approval from a Board majority that included the affirmative vote of the Class A Director. The relevant language stated:

> The Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following actions without the written consent or affirmative vote of a majority of the Board of Directors (including an affirmative vote of the Class A Designated Director) . . . .

---

[6] Ex. B § 4.2(b).

[7] *See* Dkt. 65, Ex. 2 at 283.

[8] *See id.*

5.1 Any change in the rights, powers or preferences of the Class A Stock;

5.2 The authorization, creation, or issuance of any new class or series of capital stock having rights, powers or preferences that are senior to or on parity with the Class A Stock;

5.3 Increase or decrease in the authorized number of Board Members;

5.4 Declaration of any dividend or otherwise make a distribution to holders of capital stock;

5.5 Any amendment of the bylaws or the certificate of incorporation of the Company; and

5.6 Any redemption of any shares of capital stock (other than pursuant to <u>Section 3.2</u> hereof or Section 2 of each Founder Agreement).[9]

## B.    The Second Agreement

On September 18, 2020, the Company, ZenCap, Chung, Swope, and the Class A stockholders executed an amended and restated version of the Governance Agreement (the "Second Agreement").[10] It expanded the size of the Board and added Richard Daly as another independent Common-Approved Director. Daly is the former CEO of Broadridge Financial Solutions, Inc., a corporate services and financial technology firm.[11] The Board now comprised ZenCap's three designees (Swope, Chung, and Easler), two Common-Approved Directors (Brun and Daly), and the Class A Director (Krzanich).[12]

---

[9] Ex. B § 5.

[10] Ex. C.

[11] Dkt. 65, Ex. 2 at 282.

[12] Ex. C § 4.2.

4

The Second Agreement maintained the Class A stockholders' protections. Most notably, it prohibited the Board from changing the Class A stock's "rights, powers or preferences" without the approval of a Board majority that included the Class A Director.[13]

## C. The Funds Purchase Class A Stock.

In November 2020, entities affiliated with three institutional investors (the "Funds") invested $150 million to acquire shares of Class A stock. The affiliates who became stockholders were (1) Cleveland Avenue, LLC ("Cleveland"), (2) Olympus Growth Fund VII, L.P. and Olympus Growth Fund VII Parallel, L.P. (together, "Olympus"), and (3) Movendo Capital B.V. ("Movendo"). After the purchase, they comprised some of the largest Class A stockholders.

On November 2, 2020, the Company, ZenCap, Olympus, two Cleveland-affiliated entities, Chung, Swope, and the Class A stockholders executed an amended and restated version of the Governance Agreement (the "Third Agreement").[14] It changed the Board composition to the following:

- The Company's CEO, Swope;

- Three ZenCap designees, but with Swope replaced by Daly, who was formerly a Common-Approved Director;

- One Common-Approved Director, Brun;

---

[13] *Id.* § 5.

[14] Ex. D. Movendo became a party to the Third Agreement on a later date, when it became a holder of Company securities. *See id.* §§ 1.18, 6.6.

5

- The Class A Director, Krzanich;

- One director designated by Olympus for as long as it held at least 50% of its securities;

- One director designated by Movendo for as long as it held at least 50% of its securities; and

- One director designated by Cleveland for as long as it held at least 50% of its securities.[15]

Olympus designated Manu Bettegowda, Olympus's managing partner. Movendo left its seat initially unfilled, but designated Stefan Kirsten, one of its non-executive directors, the following month.[16] Cleveland also initially left its seat unfilled, but soon designated Don Thompson, its founder and CEO, later that month.[17] Thompson became the Chairman of the Board in June 2021.[18]

The Third Agreement expanded the Class A stockholders' protective provisions. As in the First and Second Agreements, it required the Board majority to include the affirmative vote of the Class A Director, but it expanded the list of transactions to which the special voting requirement applied. The pertinent language stated:

> The Company shall not, and shall not permit any Subsidiary to, either directly or indirectly by amendment (of this Agreement or any other document, including the Certificate of Incorporation), merger, consolidation or otherwise, do any of the following actions without (x)

---

[15] *Id.* § 4.2.

[16] *See* Dkt. 65, Ex. 2 at 283.

[17] *See id.*

[18] *Id.*

the written consent or affirmative vote of a majority of the Board of Directors (including, (A) for so long as Olympus retains at least 50% of the Securities it holds as of the Effective Date, an affirmative vote of the Olympus Designated Director, (B) an affirmative vote of the Class A Designated Director, and (C) for so long as ZenCap continues to own beneficially or of record at least ten percent (10%) of the issued and outstanding Common Stock and/or Preferred Stock of the Company, an affirmative vote of the Primary ZenCap Designated Director) given in writing or by vote at a meeting, consenting or voting (as the case may be), (y) for so long as Olympus retains at least 50% of the Securities it holds as of the Effective Date, the affirmative consent of Olympus, and (z) for so long as ZenCap continues to own beneficially or of record at least ten percent (10%) of the issued and outstanding Common Stock and/or Preferred Stock of the Company, the affirmative consent of ZenCap . . . .

5.1 Change the rights, powers or preferences of the Class A Stock other than with respect to any side letters that do not provide for rights senior to or more advantageous to any party thereto (other than the Company) than previously provided to any holder of Class A Stock;

5.2 Authorize, create, or issue any new class or series of equity securities (including any security convertible or exchangeable for any such new class or series of equity securities) having rights, powers or preferences that are senior to or on parity with those granted to Class A Stock;

5.3 Increase or decrease in the authorized number of Board Members;

5.4 Authorize, declare, or pay any dividend on, or otherwise make a distribution to holders of any class of capital stock;

5.5 Amend, alter, repeal any provision of, or add any provision to, the bylaws of the Company or the Certificate of Incorporation, except for any amendment, alteration, repeal or addition that does not adversely affect the Class A Stock in a manner different than or disproportionate to any other class of Securities;

5.6 Repurchase, redeem, or otherwise acquire for value, any shares of capital stock (other than pursuant to Section 3.2 hereof or Section 2 of each Founder Agreement or the redemption of the Class B Non-Participating Preferred Stock as expressly authorized in the Certificate of Incorporation), in each case, at a price no greater than provided for in the Certificate of Incorporation;

5.7 Create or authorize the creation of any debt security or instrument or incur or guarantee indebtedness for borrowed money (excluding any accounts payable incurred by the Company in the ordinary course of business) where the aggregate amount of all such obligations at any one time is greater than $100,000,000, in each case other than in connection with any new indebtedness used to replace, refinance or otherwise eliminate existing indebtedness;

5.8 Authorize any reclassification or recapitalization of the outstanding capital stock that alters the relative rights, powers or preference of the Class A Stock with respect to any other security of the Company in any manner;

5.9 Acquire (whether by asset purchase, stock purchase, merger (but excluding any reverse merger with an entity that has no commercial operations and was primarily formed to raise capital through an initial public offering for the purpose of an acquisition (commonly known as a special purpose acquisition vehicle or a blank check company)) or other similar transaction, or combination thereof) the assets or business of any person (other than the purchase of assets in the ordinary course of business), or enter into any joint venture, in either case, that is material to the business of the Company and its Subsidiaries, taken as a whole, other than pursuant to all transactions the aggregate value of which do not exceed $50,000,000 in any fiscal year;

5.10 Enter into any contract or transaction with any director or officer of the Company, or any corporation, partnership, association or other organization of which any director or officer of the Company is a director or officer, or in which such person has a financial interest, other than (a) in the ordinary course of business in connection with such person's employment or service as an officer or director with the Company and (b) any agreement set forth on Schedule 5.10; or

5.11 Adopt or amend any Company equity incentive plan (other than an increase in the maximum number shares of Common Stock authorized for issuance, in the aggregate not to exceed 2,800,000 shares of Common Stock, as adjusted for stock splits, reverse splits, and similar recapitalizations);

5.12 Declare bankruptcy, liquidate or dissolve the Company (excluding, for the avoidance of doubt, a Liquidation Event (as defined in the Certificate of Incorporation), or make any assignment for the benefit of creditors; or

8

5.13 Consummate a public offering of the Common Stock unless such offering is a Qualified IPO.[19]

The Third Agreement was the last iteration of the Governance Agreement that the Company sent to the plaintiffs concurrently with its execution.

## D.    The Amendments That Eroded The Class A Protections

On July 15, 2021, the Board approved a term sheet for a merger with Gores Holdings VIII. Over the next eighteen months, the Company purported to amend the Governance Agreement five times. Each time, it did so without informing the plaintiffs and without their consent.

The fourth version of the Governance Agreement purportedly became effective as of September 7, 2021 (the "Fourth Agreement"). The plaintiffs never received a copy. It preserved the Class A stockholders' protections.

The fifth version of the Governance Agreement purportedly became effective as of November 10, 2021 (the "Fifth Agreement").[20] The plaintiffs did not receive a copy until they filed suit to enforce a books-and-records request in August 2023. The Fifth Agreement preserved the Class A stockholders' protections and added Hilla Sferruzza as a Common-Approved Director.

The sixth version of the Governance Agreement does not bear a specific date but purportedly became effective at some point in December 2021 (the "Sixth

---

[19] Ex. D § 5.

[20] Ex. F.

9

Agreement").[21] The plaintiffs did not receive a copy until they filed suit to enforce their books-and-records request. The Sixth Agreement excluded the Class C stock from the protective provision that limited the Company's ability to issue new classes of stock with preferences equal or superior to the Class A stock. The same month, the Company filed an amendment to its certificate of incorporation that authorized Class C stock with liquidation rights senior to the Class A stock.

The seventh version of the Governance Agreement purportedly became effective as of September 5, 2022 (the "Seventh Agreement"). The plaintiffs never received a copy. It excluded Class D stock from the protective provision that limited the Company's ability to issue new classes of stock with preferences equal or superior to the Class A stock. The next day, the Company filed an amendment to its certificate of incorporation that authorized Class D stock with liquidation rights senior to the Class A stock and pari passu with Class C stock.

The eighth version of the Governance Agreement purportedly became effective on January 5, 2023 (the "Eighth Agreement").[22] The plaintiffs did not receive a copy until they filed suit to enforce their books-and-records request. The Eighth Agreement excluded Class E stock from the protective provision that limited the Company's ability to issue new classes of stock with preferences equal or superior to the Class A stock. A few days earlier, the Company had filed an amendment to its

---

[21] Ex. G.

[22] Ex. H.

10

certificate of incorporation that authorized Class E stock with liquidation rights senior to the Class A stock and pari passu with Class C and Class D stock.

On December 5, 2022, the Company and Gores Holdings VIII announced the termination of their merger, citing unfavorable market conditions.[23]

### E. The Bridge Loans

With the merger off the table, the Company needed financing. In January 2023, the Board approved three bridge loans: (i) a $31 million loan from Cleveland, (ii) a $30 million loan from 222 N. Canal, LLC, an entity affiliated with Thompson, and (iii) a $10 million loan from Movendo. The notes for all three loans were convertible into a new series of Class F stock. The transactions with 222 N. Canal and Movendo attributed a $1 billion valuation to the Company.

The same month, Ariel offered to invest approximately $125 million in the Company (the "Ariel Proposal"). No one at the Company meaningfully considered the Ariel Proposal.

On February 3, 2023, the Board formed a special committee to consider financing proposals from "related-party investors" (the "Committee").[24] Daly,

---

[23] *Footprint and Gores Holdings VIII, Inc. Mutually Agree to Terminate Business Combination Due to Unfavorable Market Conditions*, *Footprint* (Dec. 5, 2022), https://news.footprintus.com/en/footprint-and-gores-holdings-viii-inc.-mutually-agree-to-terminate-business-combination-due-to-unfavorable-market-conditions.

[24] Compl. ¶ 99.

11

Krzanich, and Sferruzza comprised the Committee. Daly was a ZenCap designee. Krzanich was the Class A Director. Sferruzza was a Common-Approved Director.

The Board deemed the three Committee members "independent of management."[25] The Board also determined that each member "has no relationship (business or otherwise) with [Cleveland], Olympus or Movendo that would impair his or her ability to independently consider a Proposal, and has no interest in any Proposal that is different from, or in addition to, the interests of the Unaffiliated Shareholders."[26]

On March 17, 2023, the Committee considered a proposal from the Funds to invest up to $500 million in Class F stock (the "Class F Financing"). The Committee recommended that the Company proceed with the proposal.

On March 27, 2023, the Board received an offer from Shuler Capital Corp. to acquire at least 80% of all of the Company's equity (including most or all the Class A stock) at a valuation of $670 million. Shuler also proposed to invest $545 million into the Company and pay off $180 million of the Company's liabilities (the "Shuler Proposal").[27] During a meeting on March 30, the Committee acknowledged the Shuler Proposal would address the Company's "severe liquidity position and the challenges

---

[25] *Id.* ¶ 101.

[26] *Id.* (emphasis omitted).

[27] *Id.* ¶ 105.

that presented to the Company's ability to continue to operate as a going concern," but "did not deem it advisable to proceed."[28]

Also during March 2023, Apollo Global Management offered to invest in the Company at a $1 billion valuation (the "Apollo Proposal"). Neither the Committee nor the Board pursued the Apollo Proposal.

## F. The Class F Financing

On April 2, 2023, the Board approved the Class F Financing. The Funds received new Class F stock and they exchanged their Class A stock for new shares of Class A-1 stock that converted into ~1.71 times more common stock than Class A stock.

When approving the Class F Financing, the Board noted "the likelihood of insolvency based on the Company's current financial condition."[29] According to the plaintiffs, the Company's professed need for cash and desire to avoid insolvency were not the true motivations for the Class F Financing. The true motivation was to enable the Funds to seize control of the Company, wipe out the Class A stockholders' protections, and generate benefits for themselves.

## G. The Purchase Agreement

After the Board approved the Class F Financing, the Company solicited consents from stockholders who possessed the right to block it. ZenCap held a

---

[28] *Id.* ¶ 106.

[29] *Id.* ¶ 119.

blocking right, and the Company agreed to use $10 million of the proceeds from the Class F Financing to redeem shares of Class B stock that ZenCap held. The Company also converted ZenCap's remaining Class B stock into a new series of Class B-1 stock with significantly better liquidation rights than the original Class B stock.

Through affiliates, the Koch family held shares of Class D stock that carried a blocking right. The Company agreed to use $35 million of the proceeds from the Class F Financing to redeem all of the Koch family's shares of Class D stock. The Company also agreed that the Koch family would receive additional cash payments in a liquidation event or IPO, or receive additional shares.[30]

The Company could not obtain the required consent from its lenders for the Koch family's repurchase, so Cleveland stepped in to acquire their shares.[31] In exchange, the Company agreed to enhance the value of Cleveland's newly purchased shares by (i) increasing their original issue price and (ii) decreasing their conversion

---

[30] The Complaint hedges about whether the Koch family retained any shares or received additional shares and whether the family secured improved terms for its shares. At oral argument, the plaintiffs argued that the Koch family kept shares "and those shares would explode in value in the e[v]ent of a future liquidation," but later admitted that they were "not sure if the possible contractual payout in the event of a future IPO or liquidation event would flow from [retained] shares or from a separate contractual right." Dkt. 115 at 53–54.

[31] The Complaint wavers about whether the Company agreed to redeem the Koch family's Class D shares. At one point, the Complaint alleges that a redemption occurred. Compl. ¶ 127. That is consistent with the Class F Preferred Stock Purchase Agreement, which indicates that the Company "redeem[ed] all shares of Class D Preferred Stock held by Koch in the aggregate amount not to exceed $35,000,000." Dkt. 65, Ex. 17 § 1.6. But the Complaint later alleges that Cleveland purchased shares of Class C and Class D stock from the Koch family. Compl. ¶ 141.

price. Those two variables drive the conversion formula, and as a result of these changes, Cleveland's newly purchased shares would convert in connection with an IPO into nearly twenty-seven times more shares of common stock than before.[32]

Based on these agreements, ZenCap and Koch delivered their consents. On April 6, 2023, the Company executed the Class F Preferred Stock Purchase Agreement (the "Class F Purchase Agreement").[33]

## H.    The Board Shrinks.

When the Board approved the Class F Purchase Agreement, it had ten members:

- Thompson as Cleveland's designee and the Board Chair;

- Bettegowda as Olympus's designee;

- Kirsten as Movendo's designee;

- Easler, Daly, and Chung as ZenCap's designees;

- Swope as the CEO;

- Brun and Sferruzza as Common-Approved Directors; and

- Krzanich as the Class A Director.

---

[32] The Complaint meanders through these events. Initially, the Complaint suggests that the Koch family secured the enhancements before Cleveland purchased them, but later alleges that the Company approved the amendments "to benefit [Cleveland], at the expense of diluting [the Company]'s other stockholders." Compl. ¶ 141.

[33] Dkt. 65, Ex. 17.

By some unidentified mechanic, the Board shrank to four directors: Thompson, Bettegowda, Kirsten, and Sferruzza.

## I.  The Subscription Period

In crafting the Class F Financing, the Funds left unfilled 10% of the round ($50 million of the total $500 million). Cleveland committed to invest $350 million, and Olympus and Movendo committed to invest $100 million. The Funds offered the last 10% to other stockholders.

On August 11, 2023, the Company provided its stockholders with a notice, subscription agreements, and term sheet ("Term Sheet") for the Class F Financing.[34] The transaction attributed a pre-money valuation of $500 million to the Company, half of what the Board had used in two bridge loans from January 2023. At that valuation, the Class F stock would account for 50% of the equity.

The Term Sheet included a document titled "Class F Cap Table Analysis."[35] It showed the distributions each class of stock would receive based on a liquidity event that afforded the Company a $1.2 billion valuation—20% higher than the post-money valuation in the Class F Financing. Everyone would be made whole except for the Class A stockholders; they would receive just 4% of their original investment.

---

[34] Ex. E.

[35] *Id.* at 99.

The Company set September 5, 2023, as the date when the subscription period would expire. That gave prospective investors three weeks to review and decide whether to invest.

The Term Sheet did not disclose several aspects of the Class F Financing, including the Funds' favorable share conversions, amendments to the Company's charter less than a month earlier that benefitted Cleveland, or the depressed valuation of the Company used for the Class F Financing.

A ninth version of the Governance Agreement became effective in connection with the Class F Financing (the "Ninth Agreement"). The Term Sheet attached a copy.[36] It was the first version of the Governance Agreement that the plaintiffs had seen since the Third Agreement. The Ninth Agreement eliminated all of the Class A protections. It also eliminated the Class A Director.

The Class F Financing had a devastating effect on the Class A stockholders. They were pushed down to nearly the bottom of the liquidation waterfall. Their 1.4x liquidation preference was reduced to 1.0x. And if the Company's value nearly tripled from its pre-money valuation, they only would receive 4% of their original investment.

## J.    This Litigation

The plaintiffs sued, asserting claims grounded in breaches of the Governance Agreement and breaches of fiduciary duty. The plaintiffs asserted their contractual claims in the alternative based on either the Third or Fifth Agreement. At oral

---

[36] *Id.* at 44.

argument, the plaintiffs agreed that the outcome is the same under either agreement. This decision analyzes the Fifth Agreement, which is later in time.[37]

The Complaint asserts twelve counts. This decision analyzes three counts that assert contractual or contract-adjacent claims.

Count I asserts claims for breach of the implied covenant of good faith and fair dealing inherent in the Fifth Agreement. That count contends that a subset of the plaintiffs' counterparties breached implied terms in the Fifth Agreement by amending it to allow new classes of stock to be issued with superior rights and preferences. The plaintiffs assert Count I against the Company, ZenCap, Chung, the Cleveland-affiliated entities, and Olympus, but not against Swope or Movendo.

Count II contends that Krzanich tortiously interfered with the Class A stockholders' rights under the Fifth Agreement by voting in favor of the share issuances and other transactions that culminated in the Class F Financing.

Count III asserts a claim for promissory estoppel against Krzanich. The Complaint contends that he promised to act in the best interests of all Class A stockholders, which meant not approving transactions that would harm Class A stockholders.

## II. LEGAL ANALYSIS

The defendants moved to dismiss the Complaint under Rule 12(b)(6). That motion tests whether the complaint states a claim on which relief can be granted.

---

[37] The parties to the Third and Fifth Agreements were identical.

18

When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[38] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[39] "Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[40]

## A. The Inoperative Agreement Defense

As a threshold matter, the defendants argue that the plaintiffs cannot assert claims based on the Fifth Agreement because subsequent versions of the Governance Agreement superseded it. The plaintiffs argue that they are entitled to rely on the Fifth Agreement because the Company concealed it from the plaintiffs when it was in effect, and because the act of purporting to amend it breached the implied covenant. Because the plaintiffs' claims fall short even under the Fifth Agreement, this decision assumes for purposes of analysis that the Fifth Agreement remains operative and was not superseded.

---

[38] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[39] *Id.*

[40] *Id.* at 537 n.13.

19

**B.      Count I: The Implied Covenant Claims**

Count I invokes the implied covenant. As a matter of black-letter law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[41] Delaware law likewise recognizes that an implied covenant of good faith and fair dealing "attaches to every contract."[42] The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[43]

The Delaware Supreme Court has recognized that the implied covenant can apply in two different settings: (1) when a party invokes the covenant to imply an omitted right or obligation, and (2) when a party invokes the covenant to constrain a counterparty's exercise of contractual discretion.[44] This case implicates both.

---

[41] Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981), Westlaw (database updated Oct. 2024).

[42] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[43] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotation marks omitted).

[44] *See Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 253 (Del. 2026) (explaining the "two primary ways" that the implied covenant operates).

20

1. **The Claims Based On Allegedly Omitted Terms**

One use of the implied covenant is to supply an omitted right or obligation. The plaintiffs contend that the Fifth Agreement implies the existence of the following terms:

- The Class A Director must act in the best interests of the Class A stockholders.

- The Class A Director must vote against transactions that would harm the Class A stockholders.

- The Board must always have a Class A Director.

- The parties must not permit the issuance of new classes of stock with preferences superior to the Class A stock.

- The parties must not amend the charter to authorize new classes of stock with preferences superior to the Class A stock.

- The parties must not engage in interested transactions that reallocate value away from the Class A stock.

None of the allegedly implied terms is reasonably conceivable.

a. **The Law Governing The Omitted-Term Version Of The Implied Covenant**

When determining whether the implied covenant can supply an omitted term, the court initially examines the contract to determine whether a gap exists that the implied covenant could fill. If a gap exists, then the court must determine whether to use the implied covenant to fill it. Not all gaps should be filled. Only if a gap exists and should be filled does the court consider what omitted term should fill the gap. If all three requirements are met, then the court compares the allegedly wrongful conduct against the implied term to determine whether the implied covenant was breached.

21

###### i. Identifying A Gap

When a party claims that the implied covenant should supply a term, the court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[45] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[46]

The court must start by determining whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[47] "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[48]

A court thus cannot determine whether to invoke the implied covenant until after the court has determined what the contract explicitly contemplates. The court

---

[45] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[46] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

[47] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[48] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

starts with the express terms to assess what they cover. If a gap remains, then the court can move to the second step.

### ii.    Determining Whether A Gap Should Be Filled

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap."[49] "Not all gaps should be filled."[50]

One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used because doing so would grant a party what they "failed to secure . . . at the bargaining table."[51] A court must not use the implied covenant to "rewrite a contract" that a party "now believes to have been a bad deal."[52] "Parties have a right to enter into good and bad contracts, the law enforces both."[53]

Contractual gaps can also exist for other reasons.[54] One is a desire (or tacit willingness) to have common law principles apply. "Parties negotiate in the shadow

---

[49] *El Paso Pipeline*, 113 A.3d at 183.

[50] *Id.*

[51] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch.) (Strine, V.C.), *aff'd*, 861 A.2d 1251 (Del. 2004).

[52] *Nemec*, 991 A.2d at 1126.

[53] *Id.*

[54] *See generally* Karen Eggleston, Eric A. Posner & Richard Zeckhauser, *The Design and Interpretation of Contracts: Why Complexity Matters*, 95 Nw. U. L. Rev. 91 (2000). In this now-classic work, the authors discuss reasons why parties may favor contractual simplicity over contractual complexity. In their lexicon, complexity

of default principles of law."[55] Thanks to a centuries-long Anglo-American legal tradition, there are a lot of default principles. If a contract is silent, and if the default principles covering that area are well-developed, then those principles presumptively apply.[56] They fill the gap, obviating the need for the court to do so.

Strategic ambiguity can also produce gaps. Parties to a contract who anticipate disagreeing over an issue may opt to leave the issue open or the language ambiguous to preserve their positions for future litigation.[57] Perhaps the issue will not arise, in

---

means carefully spelling out lots of contract terms; simplicity means using a shorter, less-developed contract. For practical purposes, simplicity is synonymous with gaps. Factors that affect the choice between complexity and simplicity include environmental complexity, negotiation costs, asymmetric information, monitoring dynamics, evolutionary pressures and forms, convention, trust and reputation, enforcement costs, bounded rationality, and ease of renegotiation. *Id.* at 132.

[55] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 138 (Del. Ch. 2023); *see also Reinhard & Kreinberg v. Dow Chem. Co.*, 2008 WL 868108, at *3 (Del. Ch. Mar. 28, 2008) (observing when interpreting the term "defense" that "a reasonable, third-party observer understands that sophisticated parties who are represented by counsel-like those in this dispute-bargain for and draft their agreements under the shadow of established law" such that the established law informs the meaning to be given to the term when parties have not contracted for a different definition).

[56] *New Enter.*, 292 A.3d at 138; *accord Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *14 n.150 (Del. Ch. Mar. 1, 2022) (noting that "default common law rules" apply to a contractual relationship and that "contracting parties always bargain in the shadow of the common law, unless they choose expressly to disclaim it"), *aff'd*, 287 A.3d 226 (Del. 2022) (TABLE); *see Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *31 (Del. Ch. Mar. 9, 2022) (applying principle to hold that "[w]hen parties choose not to (or fail to) allocate the risk of sandbagging in their contract, the buyer may rest on its reasonable belief that it has acquired as part of the transaction the seller's implicit promise to be truthful in its representations").

[57] Claire A. Hill, *Bargaining in the Shadow of the Lawsuit: A Social Norms Theory of Incomplete Contracts*, 34 Del. J. Corp. L. 191, 200 (2009).

which case they have saved the time and effort that would go into working out a compromise.[58] If it does, then the gap or ambiguity "can be viewed as an embedded option, which the party may seek to exercise if future uncertainties play out in a particular way."[59]

Sheer complexity can produce gaps too. Commercial contracts can be long and multi-faceted.[60] Their language can be cumbersome, inartful, or imprecise. Lawyers typically start with a form, usually a precedent from a prior deal. Over time, provisions accumulate—both for good and ill. Some cover issues that arose previously and the agreement now addresses, offering contract-law versions of G.K. Chesterton's

---

[58] *See* Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 Tex. L. Rev. 1581, 1583 (2005) ("Deliberate ambiguity may be a necessary condition of making the contract; the parties may be unable to agree on certain points yet be content to take their chances on being able to resolve them, with or without judicial intervention, should the need arise."), *cited in United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 845 n.203 (Del. Ch. 2007).

[59] George S. Geis, *An Embedded Options Theory of Indefinite Contracts*, 90 Minn. L. Rev. 1664, 1669 (2006).

[60] *See* Melissa Sawyer, *Merger Agreements are Too Long*, Harv. L. Sch. F. on Corp. Governance (Nov. 28, 2025), https://corpgov.law.harvard.edu/2025/11/28/merger-agreements-are-too-long/; *see also* Steven M. Davidoff & Christina M. Sautter, *Lock-Up Creep*, 38 J. Corp. L. 681 (2013) (discussing the increasing complexity of lockups in merger agreements).

fence.[61] But others may touch on similar issues using different terms or different structures. The resulting interactions and interstices create gaps.[62]

Many contractual gaps result from resource constraints, be they temporal, financial, or cognitive. Contracting is costly, so even the most skilled and sophisticated parties will necessarily leave gaps.[63]

This last source of gaps encounters the Delaware Supreme Court's decision in *Nemec*. There, then-Chief Justice Steele wrote that the implied covenant only applies to "developments that could not be anticipated, not developments that the parties simply failed to consider."[64] In *Johnson & Johnson*, the Delaware Supreme Court reaffirmed that formulation, observing that "hindsight cannot correct oversight."[65]

Read literally, however, the "could not be anticipated" test would be impossible to overcome. With sufficient luck and creativity, virtually *any* future state of the world *could be* anticipated. The problem is not that anticipating a particular future

---

[61] According to Chesterton, "There exists in such a case a certain institution or law; let us say, for the sake of simplicity, a fence or gate erected across a road. The more modern type of reformer goes gaily up to it and says, 'I don't see the use of this; let us clear it away.' To which the more intelligent type of reformer will do well to answer: 'If you don't see the use of it, I certainly won't let you clear it away. Go away and think. Then, when you can come back and tell me that you *do* see the use of it, I may allow you to destroy it.'" G.K. Chesterton, *The Thing* 35 (1929).

[62] *See* Hill, *supra*, at 194–95.

[63] *See Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010).

[64] *Nemec*, 991 A.2d at 1126.

[65] *Johnson & Johnson*, 352 A.3d at 255.

state is impossible. The problem is that there are so many future states that parties could anticipate. Not only that, but with the benefit of hindsight, the state of the world that actually arises will seem like a future that not only could, but should have been anticipated. Were "could not be anticipated" truly the law, the implied covenant would have no meaning.

*Johnson & Johnson* makes clear that the implied covenant remains meaningful. As the justices acknowledged in that decision, "[n]o contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[66] That is because "[i]n only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive."[67] Consequently, even the most skilled and sophisticated parties will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect."[68] The implied covenant can reach those scenarios, even if they theoretically could have been anticipated by parties with sufficient resources, creativity, and luck.

---

[66] *Id.* at 254 (internal quotation marks omitted).

[67] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

[68] *Lonergan*, 5 A.3d at 1018.

The "could not be anticipated" test also cannot be literally true because the Delaware Supreme Court has recognized that "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[69] The justices have explained that "[t]he implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[70] Terms so obvious that both sides implicitly understood them are, necessarily, terms that could have been anticipated. Indeed, they were both anticipated and known, yet the implied covenant can address them because they were so basic that no one would have thought to include them in the agreement.

The "could not be anticipated" formulation thus offers a helpful reminder that courts must not too readily identify a contractual gap, but it cannot be strictly true. Rather, a court considering whether to invoke the implied covenant must assess whether the parties realistically could have addressed the contingency. "Making that assessment in turn requires resisting hindsight's seductive acuity, where knowledge of what actually happened makes the unforeseen seem readily foreseeable."[71] A gap

---

[69] *Dieckman*, 155 A.3d at 368 & n.26 (citing *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* (Kaufman Supp. 1984), § 570)).

[70] *Id.* at 361.

[71] *Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, — A.3d —, —, 2026 WL 374887, at *24 (Del. Ch. Jan. 29, 2026).

is worth filling when parties could not have realistically addressed it, either because of the circumstances they faced or their implicit understandings.[72]

### iii. Supplying An Omitted Term

If a gap both exists and should be filled, then the court must supply the omitted term. "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[73] The plaintiff therefore must show "from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[74] Put differently, the trial court must "analyze[] whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose."[75]

Here again, the Delaware Supreme Court's admonitions against freewheeling deployment of the implied covenant loom large. Wielding the implied covenant is a

---

[72] *Id.*

[73] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[74] *Katz*, 508 A.2d at 880.

[75] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1118 (Del. 2022).

"cautious enterprise,"[76] and to imply a term is a "limited and extraordinary legal remedy."[77]

When, then, should the implied covenant be used? English law has developed helpful answers that go beyond the current state of Delaware jurisprudence.[78] A leading Privy Council judgment states,

> [F]or a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that "it goes without saying"; (4) it must be capable of clear expression; [and] (5) it must not contradict any express term of the contract.[79]

On the issue of obviousness, Lord Justice MacKinnon offered a pithy test in a 1926 judgment: "Prima facie that which in any contract is left to be implied and need not be expressed is something so obvious that it goes without saying; so that, if, while the parties were making their bargain, an officious bystander were to suggest some express provision for it in their agreement, they would testily suppress him with a common 'Oh, of course!'"[80]

---

[76] *Nemec*, 991 A.2d at 1125.

[77] *Id.* at 1128.

[78] My thanks to Glenn D. West, a learned commentator on contract law, for bringing the English decisions to my attention. *See* https://www.weil.com/people/glenn-west. We were having nerdy discussions about the implied covenant unconnected to this or another case.

[79] *BP Refinery (Westernport) Pty Ltd v Shire of Hastings* (1977) 180 CLR 266, 282–83.

[80] *Shirlaw v Southern Foundries* (1926) Ltd [1939] 2 KB 206, 227.

Thus, under English law, "a term should not be implied into a detailed commercial contract merely because it appears fair or merely because one considers that the parties would have agreed [to] it if it had been suggested to them."[81] The term must also "be so obvious as to go without saying or to be necessary for business efficacy."[82] The additional requirements limit the court's flexibility in deploying the implied covenant, but using more tractable concepts than Delaware law has yet deployed.

### b. The Constituency Director Provisions

The plaintiffs argue for two implied provisions that would constrain the Class A Director. One is affirmative: The Class A Director must act in the best interests of the Class A stockholders. The other is negative: The Class A Director must vote against transactions that would harm the Class A stockholders. Both seek to treat the Class A Director as a "constituency director," *i.e.*, a director who must pursue the best interests of a designated corporate constituency rather than the best interests of the corporation and its stockholders as a whole.[83] The plaintiffs' implied provisions

---

[81] *Marks and Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2015] UKSC 72, [2016] AC 742 [21].

[82] *Id.* at [23].

[83] Other terms include "blockholder directors" and "representative directors." *E.g.*, J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33 (2015) (referencing "blockholder" directors); E. Norman Veasey & Christine T. Di Guglielmo, *How Many Masters Can a Director Serve? A Look at the Tensions Facing Constituency Directors*, 63 Bus. Law. 761 (2008) (referencing "constituency" and "representative" directors); Simone M. Sepe, *Intruders in the Boardroom: The Case of Constituency Directors*, 91 Wash. U.

would treat the Class A Director as a constituency director for the Class A stock. But it is not reasonably conceivable that the Fifth Agreement implies those terms.

The implied covenant analysis starts by asking whether there is a gap that could be filled. From one perspective, the Fifth Agreement contains a gap: It provides for the existence of the Class A Director but does not state what the Class A Director's duties are. But that gap only exists if a reader approaches the Fifth Agreement without any understanding of baseline aspects of Delaware corporate law.

The Fifth Agreement operates against an extensive backdrop of law governing a director's duties. By providing for the Class A Director and not specifying the Class A Director's duties, the Fifth Agreement left that background law in place. Relying on that law does not leave a gap, and it certainly does not leave a gap to be filled.

Delaware law does not generally recognize constituency directors.[84] Delaware law rests on the bedrock principle that directors of a Delaware corporation owe

---

L. Rev. 309 (2013) (referencing "constituency," "representative," and "designated" directors).

[84] Laster & Zeberkiewicz, *supra*, at 51 ("Delaware law has consistently rejected the concept of so-called 'constituency directors.'"); *accord* Veasey & Di Guglielmo, *supra*, at 761 (summarizing Delaware case law and concluding that "existing standards of conduct and liability incorporate the necessary flexibility to balance the potentially competing duties of constituency directors with protection of the interests of various corporate constituencies"); ABA Section of Bus. Law, *Corporate Director's Guidebook—1994 Edition, reprinted in* 49 Bus. Law. 1243, 1250 (1994) ("A director should exercise independent judgment for the overall benefit of the corporation and all of its shareholders, even if elected at the request of a controlling shareholder, a union, a creditor, or an institutional shareholder or pursuant to contractual rights."); *see* Sepe, *supra*, at 367 (summarizing Delaware case law and advocating for "turning the duty of undivided loyalty [to shareholders] into a default rule that parties could

fiduciary duties to act carefully, loyally, and in good faith to promote the value of the corporation for the benefit of its stockholders.[85] "In a world with many types of stock—preferred stock, tracking stock, common stock with special rights, common stock with diminished rights (such as non-voting common stock), plain vanilla common stock, *etc.*—and many types of stockholders—record and beneficial holders, long-term holders, short-term traders, activists, momentum investors, noise traders, *etc.*—the question naturally arises: which stockholders?"[86] "The answer is the stockholders in the aggregate in their capacity as residual claimants, which means the undifferentiated equity as a collective, without regard to any special rights."[87] Directors thus owe fiduciary duties to the entity and the entire body of stockholders generally rather than to individual stockholders or stockholder subgroups.[88]

---

opt out of by appointing constituency directors" who are "allowed to exercise residual control to the exclusive benefit of their sponsors").

[85] *See, e.g.*, *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *17 (Del. Ch. Apr. 14, 2017) (explaining that for directors to act loyally to advance the best interests of the corporation means that they must seek "to promote the value of the corporation for the benefit of its stockholders"); *see generally Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) ("[C]orporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010) (explaining that directors' fiduciary duties include "acting to promote the value of the corporation for the benefit of its stockholders").

[86] *Frederick Hsu Living Tr.*, 2017 WL 1437308, at *17.

[87] *Id.*

[88] *See, e.g.*, *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) ("[C]orporate directors do not owe fiduciary duties to individual stockholders; they owe fiduciary duties to the entity and to the stockholders as a

Those principles do not change when a particular class or series of stock, or a particular individual or group, has the ability to elect, appoint, or designate a director. Delaware decisions consistently reject the argument that the director can or should serve the particular interests of the appointing group.[89] Underscoring that point, directors breach the duty of loyalty by acting to benefit the investor that appointed them rather than pursuing the best interests of the corporation and its stockholders as a whole.[90]

---

whole."); *Gilbert v. El Paso Corp.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[T]he directors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups."), *aff'd*, 575 A.2d 1131 (Del. 1990); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *6, *10 (Del. Ch. Aug. 27, 1987) (Allen, C.) (acknowledging the "board's obligation to the corporation and all of its shareholders").

[89] *See, e.g., Phillips*, 1987 WL 16285, at *10 (holding that Delaware law "demands of directors . . . fidelity to the corporation and all of its shareholders and does not recognize a special duty on the part of directors elected by a special class to the class electing them"); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."), *decision modified on reargument on other grounds*, 636 A.2d 956 (Del. 1994); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 (Del. Ch. July 24, 2009) (stating that, "in circumstances where the interests of the common stockholders diverge from those of the preferred stockholders, it is possible that a director could breach her duty by improperly favoring the interests of the preferred stockholders over those of the common stockholders" and that the "plaintiff can avoid dismissal if the Complaint contains well-pleaded facts that demonstrate that the director defendants were interested or lacked independence with respect to this decision").

[90] *See Technicolor*, 634 A.2d at 361; *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43–56 (Del. Ch. 2013) (applying the entire fairness test where a board lacked a majority of disinterested, independent directors because the directors pursued the

The existence of this background law means that the Fifth Agreement does not contain a gap. By remaining silent on the topic of the Class A Director's duties, the parties left well-established Delaware law in place.

Even assuming that a gap existed and needed filling, the plaintiffs' proposed provisions would not be the solution. Imposing a contractual-constituency duty on the Class A Director would put that individual in the impossible position of serving two masters: The Class A Director would simultaneously owe a contractual obligation to pursue the best interests of the Class A stockholders plus a fiduciary obligation to pursue the best interests of the Company and all of its stockholders. Those obligations could readily diverge.

The Delaware Supreme Court identified a similar conflict in *Van Gorkom*, albeit in a less noticed and more widely accepted part of that controversial opinion.[91]

---

interests of the stockholders who appointed them rather than the best interests of the corporation and its stockholders as a whole).

[91] *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985). I omit the in-citation reference to *Van Gorkom*'s subsequent history, because it is convoluted and potentially misleading. Strict rules of citation call for identifying *Van Gorkom* as having been overruled in part by *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009). That case responded to *Van Gorkom*'s loose use of the term "ratification" to refer to the effect of an organic stockholder vote contemplated by the DGCL. The Delaware Supreme Court limited the use of the term "ratification" to its "classic" sense, namely situations where one decision-maker has made a decision unilaterally. *Gantler*, 965 A.2d at 713. The decision overruled *Van Gorkom* to the extent the earlier case used the term "ratification" to refer to an organic vote called for by the DGCL. *See id.* at 713 n.54. Other than on this narrow point of terminology, *Gantler* did not overrule *Van Gorkom*. Unfortunately, *Gantler*'s attempt to correct the terminology used in *Van Gorkom* created the misimpression that the case had worked a broader change in Delaware law. The Delaware Supreme Court has held subsequently that *Gantler* did not have this broader consequence. *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d

The stockholder plaintiff contended that the directors of Trans Union Corporation breached their fiduciary duties by approving a merger agreement without securing the ability to explore alternatives. The directors argued that they retained that right, at least until the stockholder vote.[92] The Delaware Supreme Court disagreed. The justices first rejected the concept of an inherent fiduciary termination right. Next, the justices looked for an express termination right in the merger agreement. Finding none, the high court concluded that the directors were locked into the contract.[93] That meant the directors faced a conflict between their duty to act in the best interests of the corporation and its stockholders and the corporation's contractual obligation to close the merger.[94]

---

304, 311 (Del. 2015). It muddies the waters to cite *Gantler* as having overruled *Van Gorkom* in part, both because *Gantler* only sought to clarify a point of terminology and because *Corwin* subsequently made clear that *Gantler* did not "unsettle a long-standing body of case law." *Id.*

[92] *Van Gorkom,* 488 A.2d at 878–79.

[93] *Id.* at 884, 887–88.

[94] *Id.* at 888. *See generally* William T. Allen, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept*, 55 Bus. Law. 653, 654 (2000) ("One of the holdings of the Delaware Supreme Court in *Smith v. Van Gorkom* was that corporate directors have no fiduciary right (as opposed to power) to breach a contract." (footnote omitted)); R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal-Protection Measures and the Merger Recommendation*, 96 Nw. U. L. Rev. 467, 468–69 (2002) ("In *Smith v. Van Gorkom*, the Delaware Supreme Court established that Delaware law does not give directors, just because they are fiduciaries, the right to accept better offers, distribute information to potential new bidders, or change their recommendation with respect to a merger agreement even if circumstances have changed." (footnote omitted)); John F. Johnston, *Recent Amendments to the Merger Sections of the DGCL Will Eliminate Some—But Not All—Fiduciary Out Negotiation and Drafting Issues*, 1 Mergers & Acquisitions L. Rep. 20, 777, 778 (BNA) (July 20,

Because of the resulting potential for conflict, corporate counsel began insisting on explicit contractual rights to explore and, if appropriate, accept a superior proposal. But for the contractual out, directors who believed themselves obligated by their fiduciary duties to pursue an alternative would face the same dilemma that beset the directors in *Van Gorkom*. Directors might decide that their duties to the corporation and its stockholders required breaching the contract, but the breach would still be a breach.[95] The corporation would face contractual remedies, including potentially damages, specific performance, or other forms of relief.[96]

---

1998) ("[T]here is . . . no public policy that permits fiduciaries to terminate an otherwise binding agreement because a better deal has come along, or circumstances have changed."); John F. Johnston & Frederick H. Alexander, *Fiduciary Outs and Exclusive Merger Agreements—Delaware Law and Practice*, Insights: The Corp. & Sec. L. Advisor, Feb. 1997, at 15, 15 ("[T]he Delaware Supreme Court held that directors of Delaware corporations may not rely on their status as fiduciaries as a basis for either: (1) terminating a merger agreement due to changed circumstances, including a better offer; or (2) negotiating with other bidders in order to develop a competing offer."); A. Gilchrist Sparks, III, *Merger Agreements Under Delaware Law—When Can Directors Change Their Minds?*, 51 U. Mia. L. Rev. 815, 817 (1997) ("[*Van Gorkom*] makes it clear that under Delaware law there is no implied fiduciary out or trump card permitting a board to terminate a merger agreement before it is sent to a stockholder vote.").

[95] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 316 A.3d 359, 397 n.124 (Del. Ch. 2024) ("[D]irectors seeking to comply with the fiduciary standard of conduct could decide to engage in efficient breach. But that does not mean that the directors' fiduciary duties overrides the corporation's contractual obligations. It simply means that the directors can engage in the same type of cost-benefit analysis as any other contractual counterparty. Directors who cause their corporation to engage in efficient breach have not freed the corporation from its contract."), *vacated after reversal of liability finding*, 342 A.3d 324 (Del. 2025).

[96] *Id.* A breach of fiduciary duty claim based on engaging or not engaging in efficient breach affects the liability of the directors. It does not affect a claim by the contractual counterparty to enforce its rights, unless both the board breached its

A contractual constituency-director obligation would give rise to the same type of conflict. Parties in the original bargaining provision would not readily agree to that outcome. Put differently, they would not view that outcome as self-evident and implicit. Borrowing from English law, the parties to the original negotiation would not regard a constituency-director provision as necessary to give business efficacy to their agreement, nor as so obvious that "it goes without saying." If an officious bystander observing the negotiations proposed the provision, the parties would not respond with a loud, "Of course!" They would recognize that the provision could create problematic conflicts and necessitate a suite of additional contractual workarounds.

In response, the plaintiffs simply insist that it would be "absurd" to think that the Class A Director would do anything other than serve their interests.[97] As the foregoing discussion shows, that perspective is not absurd. It accords with Delaware law. If indeed the Class A stockholders subjectively harbored a different understanding about whom the Class A Director would serve, then their expectation was unreasonable. It is not reasonably conceivable that the Fifth Agreement could include an implied term requiring the Class A Director to act as a constituency director for the Class A stockholders.

---

duties when entering into the contract and the counterparty aided and abetted that breach. *See C & J Energy Servs., Inc. v. City of Mia. Gen. Emps.'*, 107 A.3d 1049, 1052–54 (Del. 2014).

[97] Dkt. 95 at 74–75.

### c. The Permanent Class A Director Provision

The plaintiffs next argue for an implied provision that would require the Company to always have a Class A Director. It is not reasonably conceivable that the Fifth Agreement included that term.

This court has rejected the argument that counterparties violated the implied covenant when they used the contractually contemplated amendment process to eliminate a party's director election right.[98] This court has also rejected the argument that parties to an LLC agreement breached its terms when they used a contractually permitted merger to eliminate an investor's director designation right.[99] More generally, Delaware courts have regularly held that parties can use a merger to eliminate the protective provisions benefitting a particular class or series of stock unless the protective provisions expressly apply to a merger.[100]

---

[98] *OptimisCorp v. Waite*, 2015 WL 5147038, at *75 (Del. Ch. Aug. 26, 2015), *aff'd,* 137 A.3d 970 (Del. 2016) (TABLE).

[99] *In re P3 Health Gp. Hldgs., LLC*, 2022 WL 16548567, at *12 (Del. Ch. Oct. 31, 2022) ("If Hudson wanted to be able to assert a claim for breach of the Class D Designation Right based on a merger in which the Company did not survive and the governing documents of the successor entity did not provide for the Class D Designation Right, then Hudson needed to obtain that right explicitly.").

[100] *See, e.g.*, *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854–55 (Del. 1998); *Benchmark Cap. P'rs IV, L.P. v. Vague*, 2002 WL 1732423, at *10–11 (Del. Ch. July 15, 2002), *aff'd sub nom. Benchmark Cap. P'rs IV, L.P. v. Juniper Fin. Corp.*, 822 A.2d 396 (Del. 2003) (TABLE); *Sullivan Money Mgmt., Inc. v. FLS Hldgs. Inc.*, 1992 WL 345453, at *7 (Del. Ch. Nov. 20, 1992), *aff'd*, 628 A.2d 84 (Del. 1993) (TABLE); *Warner Commc'n, Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch.), *aff'd*, 567 A.2d 419 (Del. 1989) (TABLE). *See generally Fed. United Corp. v. Havender,* 11 A.2d 331, 334–35 (Del. 1940).

Against this legal backdrop, there is no gap to fill. The Fifth Agreement permits amendment. Nothing in the Fifth Agreement bars further amendment to eliminate the Class A Director. The counterparties properly amended it.

### d. The Implicit Veto Provisions

The plaintiffs last argue for an implied provision under which the other parties to the Fifth Agreement could not (i) permit the issuance of new classes of stock with preferences superior to the Class A stock, (ii) amend the charter to authorize new classes of stock with preferences superior to the Class A stock, or (iii) engage in interested transactions that reallocate value away from the Class A stock.[101] In substance, the Class A stockholders want an implied contractual veto over each type of action. It is not reasonably conceivable that a gap exists that the implied prohibitions could fill.

The Fifth Agreement already contains the Class A protections. Those provisions state that without the "written consent or affirmative vote of a majority of the Board of Directors (including . . . an affirmative vote of the Class A Designated Director . . . )," the Company could not take a list of specified acts.[102] With the parties having agreed upon those express terms, it is not reasonably conceivable that the Fifth Agreement implicitly contains other contractual vetoes.

---

[101] Compl. ¶ 172.

[102] Ex. F § 5.

The Class A protections address the issuance of new classes of stock with superior preferences, charter amendments, and interested transactions. The actions that the Company cannot take without the approval of the Class A Director include actions that would:

5.1 Change the rights, powers or preferences of the Class A Stock other than with respect to any side letters that do not provide for rights senior to or more advantageous to any party thereto (other than the Company) than previously provided to any holder of Class A Stock;

5.2 Authorize, create, or issue any new class or series of equity securities . . . having rights, powers or preferences that are senior to or on parity with those granted to Class A Stock;

. . .

5.5 Amend, alter, repeal any provision of, or add any provision to, the bylaws of the Company or the Certificate of Incorporation, except for any amendment, alteration, repeal or addition that does not adversely affect the Class A Stock in a manner different than or disproportionate to any other class of Securities;

. . .

5.8 Authorize any reclassification or recapitalization of the outstanding capital stock that alters the relative rights, powers or preference of the Class A Stock with respect to any other security of the Company in any manner;

. . .

5.10 Enter into any contract or transaction with any director or officer of the Company, or any corporation, partnership, association or other organization of which any director or officer of the Company is a director or officer, or in which such person has a financial interest, other than (a) in the ordinary course of business in connection with such person's

41

employment or service as an officer or director with the Company and (b) any agreement set forth on <u>Schedule 5.10</u> . . . .[103]

These provisions cover the same ground as the implied vetoes that the plaintiffs seek. Having obtained a specific set of protections covering those issues, the plaintiffs cannot now claim that a gap exists requiring more advantageous provisions.

Of course, the Class A protections do not map perfectly onto the provisions that the plaintiffs want. Assuming for the sake of argument that the mismatch gives rise to a gap, the court must ask whether it should be filled. To answer this question, imagine the original bargaining position and ponder whether, if the issue had come up at that time, the parties would have readily agreed to the specific vetoes the plaintiffs now want. It is not reasonably conceivable that the other parties would have readily agreed. Having granted the Class A protections, they would almost certainly want something in return for conferring additional rights on the Class A stockholders. To the same effect, if an officious bystander observing the negotiation suggested clarifying the Fifth Agreement to require specific Class A stockholder approval, the parties would not respond with a united, "Of course!" Although the plaintiffs might have endorsed that view, the other parties would not. They would say something like, "You already have these protections, so why do you need more?" At best, further negotiation would have ensued. It is therefore not reasonably conceivable that the implied covenant can support the implicit veto rights.

---

[103] *Id.*

## 2. The Claims Based On Discretionary Contract Rights

A second use of the implied covenant addresses situations "when a contract confers discretion on a party."[104] The plaintiffs contend that the express terms of the Fifth Agreement conferred discretionary rights that the other parties to the contract could not use in particular ways. Framed generally, they assert that the other parties had an implied obligation to exercise their discretionary rights so as to protect and preserve the Class A stockholders' rights. None of the allegedly implied restrictions on discretionary exercise is reasonably conceivable.

### a. The Law Governing The Discretionary-Exercise Version Of The Implied Covenant

The high court has stated that "[w]hen the party exploits that discretion in a manner that defeats the 'overarching purpose' of the bargain, courts may imply a requirement that such discretion be exercised reasonably and in good faith to ensure that the discretionary power is applied consistently with what reasonable parties would have agreed to at signing."[105] That framing has three apparent elements: (1) action that defeats the overarching purpose of the bargain, resulting in (2) a requirement that the discretion be exercised reasonably and in good faith so that (3) the discretionary power is applied consistently with what reasonable parties would have agreed to at signing.

---

[104] *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021).

[105] *Johnson & Johnson*, 352 A.3d at 253.

Unfortunately, each of these elements suggests a different test. The element that would allow the greatest degree of judicial intervention would require only that the discretion be "exercised reasonably and in good faith." Of those two concepts, reasonableness seems more restrictive than good faith. Standing alone, therefore, that element could allow a court to impose its own understanding of what constitutes a reasonable exercise of discretion under the circumstances.

Other statements by the Delaware Supreme Court rule out that approach. The justices have stated that the implied covenant is not "an equitable remedy for rebalancing economic interests,"[106] and it "cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document."[107]

At the other end of the spectrum, the element that would suggest the least room for judicial intervention asks whether the exercise of discretion defeats an overarching purpose of the bargain. That language comports with similar statements by the high court about the limited circumstances in which the implied covenant should be used. But when a discretionary right is expressly part of the parties' bargain, how does a court evaluate whether its use violates the overarching purpose of the bargain? A party can argue legitimately that its ability to exercise its

---

[106] *Nemec*, 991 A.2d at 1128.

[107] *Dunlap*, 878 A.2d at 441 (footnote omitted) (internal quotation marks omitted); *see Gerber*, 67 A.3d at 418 (the implied covenant "is not a free-floating duty unattached to the underlying legal documents").

discretionary right freely is part of the spirit of the bargain and fulfills its overarching purpose.

That leaves us with the third and most helpful framing. The court must evaluate whether the party is exercising discretionary power consistent with what reasonable parties would have agreed to at signing. That test recognizes that when used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract."[108] The concept of "fair dealing" similarly contemplates "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."[109] A court deploying the implied covenant "does not ask what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting."[110]

Although Delaware law has developed that standard for the branch of the implied covenant that supplies an omitted term, the same test can govern a party's exercise of a discretionary right. In essence, the discretionary right simplifies the traditional implied-covenant inquiry because the court need not look for a gap. The

---

[108] *Gerber*, 67 A.3d at 419 (emphasis omitted).

[109] *Id.*

[110] *Id.* at 418 (citing *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013)).

discretionary right produces an inherent gap. The court therefore proceeds to the next step and asks how the parties would have filled the gap in the original bargaining position. Discretion must be exercised "consistently with what reasonable parties would have agreed to at signing."[111]

This interpretive approach still leaves one problem. In *Baldwin*, the Delaware Supreme Court revived a line of authority under which a party can breach the implied covenant by acting in subjective bad faith. There, an operating agreement allowed an LLC to determine in its discretion whether a person met the standard of conduct for indemnification. A person who had been denied indemnification sued, alleging "a hostile and adverse relationship" in which the LLC terminated the plaintiff, determined that he was not entitled to indemnification, and engaged in litigation tactics intended to cause the plaintiff "to incur needless additional attorneys' fees and costs."[112] The trial court dismissed the complaint, but the high court reversed, holding that the complaint stated a claim for breach of the implied covenant because the discretionary right had to be exercised in good faith.[113]

In holding that the complaint sufficiently alleged that the defendants acted in bad faith, *Baldwin* treated the concept of bad faith under the implied covenant as

---

[111] *Johnson & Johnson*, 352 A.3d at 253.

[112] *Baldwin*, 283 A.3d at 1122.

[113] *Id.* at 1119.

synonymous with bad intent.[114] As support, *Baldwin* cited *Desert Equities*, a decision where the Delaware Supreme Court referred to bad faith under the implied covenant as a "state of mind"[115] involving "the conscious doing of a wrong because of dishonest purpose or moral obliquity."[116] *Baldwin* also cited *Amirsaleh*, a decision where this court stated a party could establish a breach of the implied covenant by showing that "the exercise of discretion was done in bad faith (i.e., that it was motivated by an improper purpose or done with a culpable mental state)."[117] Relying on those precedents, *Baldwin* credited the plaintiff's allegation that the LLC was "trying to avoid indemnification" and had "taken every opportunity it could to try to avoid paying advancement."[118] The justices treated that allegation as "sufficient—albeit, barely so" to raise a litigable issue regarding scienter sufficient to state a claim for breach of the implied covenant.[119]

In reaching this conclusion, *Baldwin* did not discuss intervening authority that called into question *Desert Equities* and *Amirsaleh*. The implied covenant is a

---

[114] *See id.* at 1118 nn.110 & 111 (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199 (Del. 1993), *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700 (Del. Ch. Nov. 9, 2009)).

[115] *Desert Equities*, 624 A.2d at 1208.

[116] *Id.* at 1208 n.16.

[117] *Amirsaleh*, 2009 WL 3756700, at *5.

[118] *Baldwin*, 283 A.3d at 1121.

[119] *Id.*

contract-law doctrine, and a breach of contract ordinarily does not turn on intent. True, drafters can craft a provision that turns on a counterparty's mental state,[120] but absent specific language, proving a breach of contract claim does not require scienter.[121] In other words, absent specific contractual language, "'[w]illful' breaches have not been distinguished from other breaches."[122] This court therefore suggested in *ASB Allegiance* that *Desert Equities* and *Amirsaleh* represented a wrong turn for purposes of the implied covenant and mistakenly imported tort concepts into an area

---

[120] *See, e.g.*, *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746–49 (Del. Ch. 2008) (interpreting merger agreement in which contractual limitation on liability did not apply to a "knowing and intentional breach").

[121] *See Hifn, Inc. v. Intel Corp.*, 2007 WL 1309376, at *13 (Del. Ch. May 2, 2007) ("[T]o the extent that [plaintiff] is contending that [defendant's] subjective motivations for wanting out of the contract give rise to an inference that it acted in bad faith, that argument fails under settled law."); *Myer Ventures, Inc. v. Barnak*, 1990 WL 172648, at *5 (Del. Ch. Nov. 2, 1990) ("[T]he contract does not require scienter for a breach to exist."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) (holding that when party enforces conditions that "are expressed, the motivation of the invoking party is, in the absence of fraud, of little relevance"), *aff'd*, 575 A.2d 1131 (Del. 1990).

[122] Restatement (Second) of Contracts, *supra*, ch. 16 intro.; *see ASB Allegiance*, 50 A.3d at 442 ("A scienter requirement might seem to uproot the implied covenant from the land of contract and replant it in the realm of tort."); *NACCO Indus., Inc. v. Applica, Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) (noting Delaware's recognition of efficient breach, which permits a party to breach intentionally without incurring additional liability beyond the ordinary contract law remedies).

of contract law.[123] In 2013, the Delaware Supreme Court in *Gerber* endorsed and adopted *ASB Allegiance*'s analysis "as a correct statement of the law."[124]

*Gerber* necessarily rejected the intent-based language from *Desert Equities* and *Amirsaleh*, implicitly overruling those decisions. *Baldwin*, however, resurrected them. After *Baldwin*, bad intent can breach the implied covenant. But because parties can breach contracts intentionally, the intent-based version of the implied covenant must be limited. How then to apply it?

Consistent with other implied covenant cases, *Baldwin* stresses that the implied covenant should come into play when "the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[125] That framing seems to recognize that when parties enter into a contract, they join together in a cooperative enterprise to create joint surplus— the proverbial fruits of the bargain.[126] As the *Restatement (Second) of Contracts*

---

[123] *See ASB Allegiance*, 50 A.3d at 440–42.

[124] *Gerber*, 67 A.3d at 418.

[125] *Baldwin*, 283 A.3d at 1119 (quoting *Dieckman*, 155 A.3d at 367 (quoting *Nemec*, 991 A.2d at 1126)).

[126] *See Contrarian Funds L.L.C. v. Westpoint Int'l, Inc.*, C.A. No. 2617-CC, at 6 (Del. Ch. Nov. 3, 2010) (TRANSCRIPT) ("[C]ontracts are entered into for the benefit of all parties to the contract."), *aff'd*, 26 A.3d 213 (Del. 2011); *see also Northview Motors, Inc., v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000) (alluding to the "mutual benefits created by legally binding agreements"); *Barbara v. MarineMax, Inc.*, 2013 WL 1952308, at *5 (E.D.N.Y. May 10, 2013) ("[C]ourts expect that parties will be guided by self-interest to enter into mutually beneficial contracts in the first place." (citing *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577

explains, parties commit themselves to advancing "an agreed common purpose."[127]

While parties to a contract obviously are not fiduciaries and are free to act in their own interests, they have committed themselves to a joint effort.[128]

When looking to what parties would have agreed to when bargaining originally, a court must take into account that shared purpose. Given their agreed

---

(2d Cir. 1994))); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997) ("all contracting parties presumably contract for their mutual benefit").

[127] Restatement (Second) of Contracts, *supra*, § 205 cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."); *see* 1 Williston On Contracts § 1:1 (4th ed. 2008), Westlaw (database updated May 2025) ("Contract law is designed to protect the expectations of the contracting parties. It is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining. The goal of contract law is to hold parties to their agreements so that they receive the benefits of their bargains." (footnotes omitted)); 17A Am. Jur. 2d Contracts § 362 (under the implied covenant of good faith and fair dealing, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). *See generally* Alan Schwartz & Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 Yale L.J. 541, 552–54 (2003) ("Bargaining power . . . is exercised in the division of the surplus . . . . Parties jointly choose the contract terms so as to maximize the surplus . . . .").

[128] *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1005 (Del. Ch. 2023); *see Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005) (alluding to the "wealth-creating and peace-inducing effects of civil contracts"), *aff'd in part, rev'd in part on other grounds*, 892 A.2d 1068 (Del. 2006). *See generally* Schwartz & Scott, *supra*, at 544 ("[C]ontract law should facilitate the efforts of contracting parties to maximize the joint gains (the 'contractual surplus') from transactions."); Gerrit De Geest, *N Problems Require N Instruments*, 35 Int'l Rev. L. & Econ. 42, 46 (2013) ("[T]he fundamental goal of contract law [is] to maximize the joint surplus of the parties . . . ."); Jeffrey L. Harrison, *A Case for Loss Sharing*, 56 S. Cal. L. Rev. 573, 594 (1983) ("Partnership law and contract law are both designed to foster the sharing of a jointly created surplus.").

common purpose, a party in the original bargaining position would expect that the counterparty would not use a discretionary right to destroy the contractual relationship maliciously and without any justification rationally related to the shared contractual purpose.[129] That premise is so basic that asking for a commitment against malicious action would be unthinkable.[130] Framed from the English law perspective, a party to the negotiation who raised the issue would be met with the response that "it goes without saying."[131] If an officious bystander observing the negotiation suggested confirming that the contract prohibited a party from using a discretionary right to destroy the contractual relationship, both sides would immediately say, "Of course!"

Exercising a discretionary right maliciously and without a contractual justification goes beyond self-interested action and transcends situations involving efficient breach.[132] The general rule remains: A party has wide discretion within which to wield a discretionary right consistent with the parties' understandings from their original bargaining positions. A party obviously can wield a discretionary right to promote contractual goals and create joint surplus. Just as obviously, a party can wield a discretionary contractual right to protect its own interests. A party with a

---

[129] *Calumet*, 2026 WL 246995, at *29.

[130] *See ArchKey*, 302 A.3d at 1005.

[131] *BP Refinery*, 180 CLR at 282–83.

[132] *Calumet*, 2026 WL 246995, at *29.

good faith basis for its determination cannot be held liable for the intent-based version of the implied covenant.[133] "But a party cannot wield a discretionary contractual right like a mafia gangster by using it to inflict harm on the counterparty unless the counterparty does what it wants."[134]

### b. The Discretionary Contract Rights

The plaintiffs allege that the defendants breached the implied covenant by inappropriately exercising the discretion they possessed under the Fifth Agreement. The plaintiffs claim that the defendants had an implied obligation to exercise their discretionary rights to protect and preserve the Class A stockholders' rights. The protection of the implied covenant does not go so far.

The plaintiffs set out in the wrong direction by arguing for a best-interest duty. An obligation to act in the best interests of another party is a fiduciary duty, not a contractual one. The parties to the Fifth Agreement committed themselves to advance a shared purpose, but they were generally free to act in their own interests. The plaintiffs continue in the wrong direction by failing to frame any constraint on the

---

[133] *See New Wood Res. LLC v. Baldwin*, 2023 WL 4883924, at *9 (Del. Super. July 31, 2023) ("While one could argue negligence from these facts, or that ACR was just plain wrong in its assessment, no reasonable jury could find bad faith from them. Further, no other facts exist in this record to show, for instance, that Mr. Bursky harbored any personal animus or intentionally sought to harm Dr. Baldwin, when he executed the Written Consent as President of ACR."), *aff'd*, 315 A.3d 445 (Del. 2024).

[134] *Calumet*, 2026 WL 246995, at *29.

exercise of the defendants' discretionary rights in terms of what the parties would have contemplated during their original bargaining.

Eventually, the plaintiffs do inferably argue that the defendants set out to harm them by depriving the Class A stockholders of their liquidation preference and reallocating most of the value of their shares to the more senior classes of equity. The Complaint's allegations, however, defeat this theory.

The Complaint does not support the inference that the defendants acted maliciously and without any justification rationally related to the parties' shared contractual purpose. The Complaint acknowledges that the Company needed financing. The Complaint alleges that the defendants should have considered and pursued the Shuler, Ariel, and Apollo Proposals, instead of approving the Class F Financing to benefit themselves and their affiliates, but the Complaint acknowledges that some form of financing transaction was warranted.[135] That means that the defendants had a contractually grounded reason for pursuing the Class F Financing. Facing a situation where the Company could fail and the investors end up with

---

[135] *See, e.g.*, Compl. ¶¶ 106–08, 110 (alleging that the Shuler Proposal was a "favorable opening proposal" that "could have been sweetened," would have addressed the Company's "severe liquidity position and the challenges that presented to the Company's ability to continue to operate as a going concern," and "would have provided a much more 'meaningful return to the Company's stakeholders'" than the Class F Financing); *id.* ¶ 115 (alleging that the Board failed to "run a meaningful process to find possible alternative financing sources"); *id.* ¶ 198 ("The opportunities presented by Shuler, Apollo, and Ariel were clearly superior to the Class F [Purchase Agreement] in that they would have been beneficial to all stockholders and, indeed, likely could have been sweetened with just some negotiation by the Special Committee.").

nothing, the defendants could properly exercise their contractual rights to obtain the financing the Company needed.[136] It is not inferable that the defendants approved the Class F Financing for the sole purpose of harming the Class A stockholders, so the claim based on the discretionary-exercise version of the implied covenant fails.

## C.    The Remaining Claims

After working through the implied covenant claims, the two remaining contract-adjacent claims become easy. Neither states a claim on which relief can be granted.

### 1.    Count II: The Tortious Interference Claim

Count II contends that Krzanich tortiously interfered with the implied terms in the Fifth Agreement. Delaware follows the *Restatement (Second) of Torts* when analyzing a claim for tortious interference with contract.[137] Generally, "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other."[138] Reframed as

---

[136] *See* Ex. E at 12–13 (the Term Sheet's risk factors disclosing that the Company has a "history of net losses" and the Class F Financing "alleviated substantial doubt about [the Company's] ability to continue as a going concern"); Compl. ¶ 119 ("[T]he Board approved the Class F transaction, noting 'the likelihood of insolvency based on the Company's current financial condition.'").

[137] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010).

[138] Restatement (Second) of Torts § 766 (Am. L. Inst. 1979), Westlaw (database updated Sept. 2025).

elements, a plaintiff must plead: (1) a contract, (2) the defendant's knowledge of it, and (3) an intentional act that is a significant factor in causing a breach of the contract, (4) done without justification, (5) that causes injury.[139] Without an underlying breach of contract, a tortious interference claim is not viable.[140]

The intentional act causing the breach need not be tortious, only intentional.[141] An independently tortious method of interference makes a finding of improper interference more likely. Therefore, "the nature of [the] conduct is an important factor," but an inherently tortious method of interference—such as an act of fraud or other wrongdoing—is not required.[142]

Here, the tortious interference claim fails because it is not reasonably conceivable that there was a breach of any implied term. Because the plaintiffs have failed to plead an underlying breach, their tortious interference claim falls short.

---

[139] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013); *see NAMA Hldgs.*, 2014 WL 6436647, at *25–26 (applying law for analyzing claims for tortious interference with contract to claim for tortious interference with the implied covenant).

[140] *See STX Bus. Sols., LLC v. Fin.-Info.-Techs., LLC*, 2024 WL 4645104, at *6 (Del. Ch. Oct. 31, 2024), *aff'd*, 342 A.3d 399 (Del. 2025) (TABLE).

[141] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2024 WL 4115729, at *38 (Del. Ch. Sept. 9, 2024), *aff'd in part, rev'd in part and remanded*, 2025 WL 3537343 (Del. Dec. 10, 2025) (TABLE); Restatement (Second) of Torts, *supra*, § 766 cmt. c.

[142] Restatement (Second) of Torts, *supra*, § 766 cmt. c.

### 2. Count III: The Promissory Estoppel Claim

Count III asserts that by accepting his appointment as the Class A Director, Krzanich promised to act in the best interests of the Class A stockholders, make decisions that would protect the rights and preferences of the Class A stock, and vote against transactions that would harm the Class A stockholders. The plaintiffs assert that Krzanich broke his promise by engaging in the same conduct underlying Count II. This theory also fails.

A claim for promissory estoppel requires a plaintiff to show: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[143]

"Historically, courts have treated promissory estoppel as a consideration substitute . . . ."[144] In other words, the doctrine of promissory estoppel existed to "hold[] individuals liable on their promises despite the absence of consideration."[145] Over time, however, "the doctrine appears to have evolved in Delaware into one that provides a basis for expectancy relief," and promissory estoppel is viewed as an

---

[143] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347–48 (Del. 2013).

[144] 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.02[c], at 15-11 to -12 (2d ed. 2025).

[145] 4 Williston on Contracts, *supra*, § 8:4.

equitable remedy that "often turn[s] on 'whether injustice could be avoided only by an enforcement of the promise.'"[146] "The prevention of injustice is the 'fundamental idea' underlying the doctrine of promissory estoppel."[147]

Promissory estoppel is a "narrow doctrine, designed to protect the legitimate expectations of parties rendered vulnerable by the very processing of attempting to form commercial relationships."[148] The "routine role" of promissory estoppel "should be to assure that those who are reasonably induced to take injurious action in reliance upon non-contractual promises receive recompense for that harm."[149]

"Delaware courts have been careful when considering promissory estoppel claims to avoid rendering them an imprecise judicial cost-shifting exercise."[150] The promise must "be a real promise—mere expressions of expectation, opinion, or assumption are insufficient."[151] "The promise must also be reasonably definite and

---

[146] 2 Wolfe & Pittenger, *supra*, § 15.02[c], at 15-12 (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *10 (Del. Ch. Dec. 8, 2009)).

[147] *Chrysler Corp. (Delaware) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1034 (Del. 2003).

[148] *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006).

[149] *Id.*

[150] *Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *32 (Del. Ch. Oct. 26, 2022) (internal quotation marks omitted), *aff'd*, 303 A.3d 51 (Del. 2023) (TABLE).

[151] *Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 804 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) (TABLE); *see Riverside Risk Advisors*, 2022 WL 14672745, at *32–33.

certain."[152] The Delaware Supreme Court has instructed that promissory estoppel does not apply "where a fully integrated, enforceable contract governs the promise at issue."[153]

Under this test, the plaintiffs' allegations do not support a reasonably conceivable inference of an enforceable promise. They claim that by agreeing to serve as the Class A Director, Krzanich promised to act in the best interests of the Class A stockholders, protect their rights and preferences, and vote against transactions that would harm them. But that is not a reasonable inference for the same reason that it is not reasonable to imply an obligation under the Fifth Agreement.

The Fifth Agreement states that a Board majority that included the affirmative vote of the Class A Director could (1) create new classes of stock with rights, powers, and preferences senior to those granted to the Class A stock and (2) authorize any reclassification or recapitalization of outstanding stock that changes the rights, powers, and preferences of the Class A stock relative to another security.[154] A neophyte reader without a background in corporate law might think that Krzanich implicitly promised to protect the Class A stockholders, but that is not a reasonable reading. That promise would inherently conflict with the Class A Director's fiduciary

---

[152] *Territory of U.S. V.I.*, 937 A.2d at 804.

[153] *SIGA Techs.*, 67 A.3d at 348.

[154] Ex. F § 5.

58

duties to the Company's stockholders as a whole. It would turn the Class A Director into a constituency director, contrary to Delaware law.

The plaintiffs have failed to adequately plead that Krzanich made a promise, so the court need not consider the remaining elements of a claim for promissory estoppel. The motion to dismiss Count III is granted.

## III.   CONCLUSION

The motions to dismiss are granted as to Counts I, II, and III.

59